THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

| | |
|---|---|
| MK LIM, INC., DBA BEST LYNNWOOD MOTOR INN, a Washington corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>GREENWICH INSURANCE COMPANY, an insurance company,<br><br>            Defendant. | No.  CV10-00374 MJP<br><br>**PLAINTIFF'S SUPPLEMENTAL FRCP 26(a)(2) DISCLOSURE OF EXPERT TESTIMONY** |

COMES NOW the plaintiff, MK Lim, Inc., dba Best Lynnwood Motor Inn, by and through its attorney of record, Michael T. Watkins, pursuant to Federal Rule of Civil Procedure 26(a)(2) and this Court's orders and states as follows:

A.    **EXPERTS:**

1.    Gary Williams
        Williams Law Office
        252 Blueberry Hill Dr.
        Quilcene, WA 98376
        360-765-0729

PLAINTIFF'S SUPPLEMENTAL FRCP 26(a)(2) DISCLOSURE
OF EXPERT TESTIMONY — 1

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA 98102
206/400-6640; FAX: 206/971-5080

Mr. Williams is expected to testify as to the nature and extent of the MK Lim, Inc. dba Best Lynnwood Motor Inn's claims under the applicable insurance policy, the applicable standard of care for insurers and adjusters adjusting insurance claims in Washington State, and the acts and omissions of defendant Greenwich Insurance Company during the adjustment of the subject insurance claim.

Please see Mr. Williams' Expert Report attached hereto as Exhibit 1.


2.      Michael Ruble
        1260 Thalen Drive
        Lynden, WA 98264

Dr. Ruble is an economist.  He is expected to testify as to the nature and extent of the economic losses suffered by the plaintiff as a result of the wrongful acts and omissions of defendant Greenwich Insurance Company.

Please see Dr. Ruble's Expert Report attached hereto as Exhibit 2.


Plaintiff reserves the right to supplement this disclosure as further discovery warrants.

Plaintiff also reserves the right to call at the time of trial any witnesses identified by Defendant.


DATED this 27th day of September, 2010.


                            LAW OFFICES OF MICHAEL T. WATKINS


                            /s/ Michael T. Watkins
                            Michael T. Watkins, WSBA #13677
                            Attorney for Plaintiff


PLAINTIFF'S SUPPLEMENTAL FRCP 26(a)(2) DISCLOSURE
OF EXPERT TESTIMONY — 2

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA 98102
206/400-6640; FAX: 206/971-5080

1

2

3

4

5               UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF WASHINGTON
6                        AT SEATTLE

7  | MK LIM, INC., DBA BEST LYNNWOOD       | No.  C10-00374 MJP
   | MOTOR INN, a Washington corporation,  |
8  |                                        |
9  |               Plaintiff,               | **CERTIFICATE OF SERVICE**
10 |          v.                            |
11 | GREENWICH INSURANCE COMPANY,          |
   | an insurance company,                  |
12 |                                        |
   |               Defendant.               |
13

14      Under penalty of perjury under the laws of the State of Washington, I declare that on this

15  27th day of September, 2010, I electronically filed the foregoing with the Clerk of the Court using

16
    the CM/ECF system with which will send notification of such filing to the following:
17

18  William Leedom
    Timothy Allen
19  Bennett, Bigelow & Leedom, P.S.
    1700 Seventh Avenue, Suite 1900
20  Seattle, WA 98101
    206-622-5511
21

22  _____

23  Sonia Chakalo

24

25

CERTIFICATE OF SERVICE — 1

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVE. E
SUITE 115
SEATTLE, WA  98102
206/400-6640; FAX: 206/971-5080

# EXHIBIT 1

### WILLIAMS LAW OFFICE
#### 252 BLUEBERRY HILL DRIVE
#### QUILCENE, WASHINGTON  98376

**GARY  WILLIAMS**

PHONE          (360) 765-0729
FAX              (360) 614-9556
EMAIL     GW@AREYOUCOVERED.COM
WEB     WWW.AREYOUCOVERED.COM

# Lim v. Greenwich Insurance Co.

## Expert Report of Gary Williams

## I. Qualifications

- Claims adjuster/supervisor from 1968 through 1980,  for Safeco and American States
- Independent adjuster during law school, 1975-1979, focused on first party claims
- Insurance law practice since 1979, both as defense and policyholder's counsel
- Designed and taught a program in insurance adjusting at Pierce College
- Consult and occasionally testify regarding claim handling issues
- Lecture at continuing legal education seminars on insurance law and litigation
- Published both locally and nationally on claim handling, appraisal, and related insurance subjects.

Please see my attached curriculum vitae, Exhibit A, for more detail, and a list of publications and deposition and trial testimony.

## II. Materials Reviewed and Data Considered

I reviewed and considered the claim file produced in discovery, including the policy,  and files produced by defendant as additional claim files.  I reviewed the Washington Unfair Claims Practices Regulations, the Insurance Fair Conduct Act, and case law.

## III. Opinions

### A. The Insurance Claim

On August 10, 2008, Best Lynnwood Motor Inn was damaged by fire. The insureds had only owned the motel for a short time. The fire was started by a destitute guest who

1

believed the Red Cross would help her if she was a fire victim. She claimed to suffer from multiple personality disorder and traveled with a service cat.

The Lims reported the claim and Greenwich immediately established a reserve of $815,000. The insureds retained Bud Dyer, an experienced, knowledgeable public adjuster ("PA"). Mr. Dyer has specialized knowledge in fire damage repair, particularly damage to buildings. Greenwich increased the reserve to $950,000.  There were no early coverage issues, as the protective safeguard endorsement was satisfied, the fire was not suspicious, and there was no obvious coinsurance problem.

In the claim file, at KC00533-4, Greenwich initially described the various claims and damage:

### BUILDING

This motel consists of two buildings: (1) small building with the office and 3 units, 1 of which is a manager quarter? (sic) this building was not affected by the fire and (2) large building, two stories with 34 rooms. The fire originated in room 111 ? (sic) the room is a total Joss. The room directly above 111 room 222 sustained extensive heat and smoke damage. Both hallways are black, the carpet melted, the tops of the hallways (end to end) are charred and fire spread into both stairs cases.

All 34 rooms sustained some damage? 2 rooms sustained extensive fire and smoke damage, 7 rooms sustained moderate smoke damage and 25 rooms sustained light smoke damage. The fire department kicked or chopped down doors to rooms and cut holes in the roof. We estimate the building damage at $750,000. We are issuing advance payment PENDING.

### CONTENTS:

Each room is about 240 sq. ft. and consists of a bed, two night stands, entertainment centers, TV, refrigerator and kitchenettes. The contents within the 32 rooms will require cleaning. The contents within rooms 111 and 222 will require replacement We estimate the content damage at $50,000. PENDING.

### INCOME:

The main building lost power and has been shut down due to the extent of damage (34 rooms). The building will be down during the course of repairs and will be brought up in phases as rooms are repaired for a couple of months.

The rooms rent for approximately $65 per night or S300 per week. Based on a three month time-frame, we estimate the income loss at $150,000 [this policy has a 90 day limitation for ordinary payroll). We retained a CPA to

determine the insured's income loss PENDING.

So far, this appeared to be an uncomplicated, everyday fire claim. Greenwich's estimate that the motel could be back in business within three months of the fire was extremely optimistic.

On August 27, 2008, Greenwich was working with Scott Penner, a Seattle lawyer. The file does not explain why a lawyer was involved so soon in the claim process. I am not privy to notes or details of Penner's involvement, as Greenwich withheld the details of these communications as "Attorney Client Work Product." I see no reason for counsel's involvement at this point – the fire was not suspicious, there were no coverage questions, no litigation had been filed or threatened. Absent any legal issue requiring counsel, Greenwich may have been conducting adjusting activities through Mr. Penner in order to avoid discovery of its claim handling.

Greenwich hired Mike Kennedy, an independent adjuster ("IA") with Washington Oregon Claims service, and asked him to hire McBride Construction and estimate the damages to the building. McBride Construction is a Seattle contractor which does fire repairs for insurance companies.

Kennedy was asked by Greenwich to reach an agreed cost of repair with the insured's public adjuster, Bud Dyer. Dyer hired Allpro, another local insurance repair contractor. Now the claim is populated with an adjuster and a contractor on each side. This is standard procedure in a large fire loss. Here is how it should work going forward:

> The IA (Kennedy), the PA (Dyer), and their respective contractors (McBride and Allpro) meet at the loss site and jointly discuss the scope of damage. They agree on a scope of repairs – the extent of damage and how to fix it. Then they separately price the agreed scope. Then they negotiate differences in pricing and reach an agreed cost of repairs. This is a speedy, efficient way to handle a fire insurance claim. It works well when the participants are experienced fire repair people, as they were here.

> Once the major disagreements are resolved, the insured can start repairing or replacing the damaged building. As repairs progress, the public adjuster (PA) will prepare an inventory of damaged and destroyed contents. The IA may also get an inventory. The contents claim is ready for payment after the IA verifies the inventory and pricing, and the adjusters negotiate remaining differences.

> During this time, the insured is protected by business interruption coverage. Although BI coverage has time and amount limits, those will seldom create a problem if the building repairs are agreed upon early in the process, so repairs can start soon after the fire. In a fire claim like this one, the rebuilding should have started about 30 days after the fire, plus some delay to get permits and approvals from the city. Another four or five months would be required to repair the building. With the usual delay or two, the claim is over and the insured is back in business six or seven months after the fire.

3

That did not happen here. Six months after the fire, February, 2009, Greenwich had refused to accept agreement on the scope or price to repair the building. The parties were preparing for appraisal. Both sides had hired lawyers and appraisers.

Proofs of loss had been filed in October but not paid. Greenwich fired McBride in September, fired adjuster Mike Kennedy, then hired and fired Alliance, another local building contractor. This happened because the insurer's contractors agreed with Allpro's scope. Greenwich would not accept the estimates and agreements of its own contractors or its own independent adjuster. Six months after the fire, when the Lims should have been back in business, the claim was going nowhere, and the policyholder was going broke.

## B. Standards of Good Faith Claim Handling

Before we get to whether Greenwich Insurance met standards of good faith and fair dealing, let's review what those standards are. A recent opinion from the Supreme Court of Washington said:

> Washington's insurance bad faith law derives from statutory and regulatory provisions, and the common law. The insurance code begins with recognition that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW 48.01.030. The insurance code permits the insurance commissioner to promulgate administrative regulations governing the claims-handling process. RCW 48.30.010. To this end, the commissioner has adopted chapter 284-30 WAC. A violation of the insurance code or a regulation promulgated thereunder constitutes an unfair practice under the CPA. See RCW 48.30.010. This court long ago recognized that a single violation of a claims handling regulation may violate the CPA. *Industrial Indemnity Co. v. Kallevig*, 114 Wn.2d 907, 921, 792 P.2d 520 (1990).

*St. Paul Fire & Marine Ins. Co. v. Onvia, Inc*, 165 Wn.2d 122, 196 P.3d 664 (2008). In addition, Washington recently enacted the Insurance Fair Conduct Act, RCW 48.30. The statute forbids unreasonable denial of a claim for coverage or payment of benefits to any first party claimant. It also subjects insurers to new penalties for violations of the Unfair Claims Practices Regulations.

All of the standards of good faith claim handling are based on one thing – the insurance company's duty to help the insured recover from a loss. Common law standards of good faith claim handling are not written in the policy, but are implied. When insurers talk about "good hands" or "getting you back where you belong," they are promising good faith claim service.

The essence of good faith claim service is to remember always that the claims professional's job is to help, not hurt the damaged policyholder. A first party claim should not be an adversarial proceeding. The money which pays for an insurer's investigation and

adjustment comes from premium dollars. Premium dollars come from policyholders, so the insurer's investigation and adjustment should benefit the policyholder who paid for it.

These principles are not generally known or appreciated by the general public, who believe an adjuster's job is to pay as little as possible. To the contrary, an adjuster's job it to pay what is owed according to the policy, no more and no less, and to do it as soon as possible.

## C. Violations of Standards of Good Faith Claim Handling

Greenwich Insurance Company failed to handle this claim within commonly accepted standards. The claim was unreasonably denied for months because Greenwich tried to pay as little as possible, regardless of the consequences to the Lims.

**1. Unreasonable failure to pay benefits.** Greenwich violated its duty to the Lims when it unreasonably failed to promptly pay policy benefits. Greenwich's independent adjuster and contractor had agreed, very soon after the fire, with Lim's approach to repairing the building. Mr. Kennedy, Mr. Dyer, and their respective contractors agreed on a scope of repair. Greenwich fired Kennedy and McBride. Greenwich hired Alliance, the second contractor, then fired Alliance for agreeing with Lim's contractor.

Lim demanded appraisal on January 9, 2009. By this time, the fire was five months old and there was no agreement on scope or price. Greenwich had hired and fired two local specialty contractors who weren't cheap enough for Greenwich. The delay was financially devastating to the Lims and the claim was going nowhere.

Little happened for months. Finally, in June, 2009, ten months after the fire, Greenwich hired a new contractor, Nordic Construction. Like Alliance and McBride, Nordic is an insurance repair contractor and gets its business from insurance companies. Nordic is one of the oldest, most respected of Seattle insurance specialty contractors, and has a very good reputation in the local insurance claim community.

When Greenwich hired Nordic, the parties were far apart on the building claim. Greenwich had paid the claim based on a building repair figure of $346,784. Lim (using Allpro) was at $961,776. The claim was stalled and Lims were close to bankruptcy. Greenwich was stonewalling; it refused to give Lims a copy of the Alliance estimates, claiming Alliance had just copied Allpro. The secret estimates from Alliance were in the $720,000 to $880,000 range. This was too high for Greenwich. So Greenwich hired Nordic.

Nordic came in at $1,052,232.

At this point, one would expect the insurer to realize that everyone saw this as a $900,000 building claim. Indeed, even Greenwich had reserved the claim near that level. But no, Greenwich was not quite done.

Greenwich had Nordic redo the estimate several times, then fired Nordic. Nordic was apparently too high for Greenwich. So was everyone else. Greenwich said Nordic was

5

"out of whack," and buried its estimates. It is now late July, nearly one year after the fire. The Lims are going broke. At least the claim was in appraisal. It had to get resolved sometime.

But where would Greenwich find a cheaper contractor? We were in a recession; business was bad. Seattle was running out of insurance contractors. Only the old, established, respected contractors were left. All of these agreed with the Lims.

Greenwich found one in Oregon. Lorentz Bruun, a Portland insurance contractor, was hired to provide an estimate for Greenwich. This was a perfect fit – Lorentz Bruun was located far enough away that it had no fear of being hired to actually repair anything. It could bid the job as low as Greenwich wanted. Lorentz Bruun bid $826,306 and Greenwich adopted the bid[1]. The basis for Greenwich's numbers is not altogether clear. Greenwich said it would immediately pay based on this bid, but did not. The failure to pay after promising to do so was unreasonable.

The appraisal could now proceed; Greenwich had a bid. On November 12, 2009, one year and three months after the fire, the appraisers settled on $912,682 as the cost to repair the building. They appraised the contents loss at $134,769 / 83,322 as of February 5, 2010. The building and contents claim required one and one half years to adjust. Greenwich had collected at least 18 estimates to repair the building. The Lims were going broke. If they could not get into business soon, they would not be able to fight Greenwich any more.

It was unreasonable for Greenwich to delay this claim while it searched for the cheapest contractor in the Pacific Northwest. If one gets enough estimates from enough contractors, one will eventually get a very low estimate. Doing that is not reasonable or proper claim handling. A reasonable insurer would have understood that Allpro, McBride, Alliance and Nordic were all in the same ballpark. These companies estimate fire losses in Seattle every day.

It is bad faith when an insurer delays the claim while looking for an artificially low estimate when the insured suffers from the delay. It is bad faith to search for an estimate which is unreasonably low. It is also bad faith to withhold estimates with the appraisal panel, and from the policyholder. Obtaining repair estimates is part of investigating and evaluating a loss. This must always be done in a balanced, fair, objective manner which is calculated to find a realistic number. It is to be done as much for the insured's benefit as for the carrier's benefit. Greenwich had a clear duty to disclose those estimates to the Lims as soon as it received them. Greenwich had a clear duty to provide these estimates to the appraisal panel.

Failure to accept and pay the building claim in early September, 2008 was unreasonable, and was a breach of the insurer's implied duty of good faith and fair dealing. After that, the

---

[1]

It was not just a low repair number Greenwich searched for – it also wanted an estimate with a high proportion of code repairs. The policy contained a code sublimit, so a high enough code repair number would pass most of that loss on to the Lims.

insurance company took action which damaged the policyholder again and again. The Lims were hurt by the fire, but hurt even more by Greenwich's failure to properly handle the claim.

**2. Unfair Claim Practices Regulations violations.** WAC 284-30, the Unfair Claim Practices Regulations, define many aspects of good faith claim handling. Greenwich Insurance Company violated many of these standards, including:

> **284-30-330. Specific unfair claims settlement practices defined.**
>
> The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, specifically applicable to the settlement of claims:
>
> (1) Misrepresenting pertinent facts or insurance policy provisions.
>
> (2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.
>
> (3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.
>
> (4) Refusing to pay claims without conducting a reasonable investigation.
>
> (5) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.
>
> (6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.
>
> ...
>
> (7) Compelling insureds to institute or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings.
>
> (12) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.
>
> (13) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.
>
> (14) Unfairly discriminating against claimants because they are represented by a public adjuster.
>
> (18) Failing to make a good faith effort to settle a claim before exercising a contract right to an appraisal.

Greenwich Insurance Company violated WAC 284-30-330 (1), (2), (3), (5) and (13) by not communicating properly or timely with the policyholder. It violated (4) because its investigation was unreasonable – no insurer should disregard good evidence of value simply because it seems too high. Greenwich violated (7) by offering next to nothing, requiring the insured to demand appraisal.

Greenwich's performance on this claim was far beneath the standards and duties required of insurers in Washington. Sometimes we see poor adjusting practices when fraud or owner arson are suspected. That was not the case here. Greenwich may have been motivated to fight by the fact that Lims had a public adjuster. WAC 284-30-330(14) forbids discriminating against insureds because they hire a PA.

Greenwich Insurance Company violated administrative standards by failing to resolve this claim in a timely manner. During the investigation, Greenwich Insurance Company was required to keep the policyholder informed of the progress of the investigation and any need for more time to investigate, if the claim cannot be resolved early. See *WAC 284-30-370. Standards for prompt investigation of claims:*

> Every insurer shall complete investigation of a claim within thirty days after notification of claim, unless such investigation cannot reasonably be completed within such time...

Here, Greenwich appears to have spent month after month trying to manufacture or find a lowball estimate. This is not a valid excuse, nor is it a reasonable investigation. The investigation into the amount of loss on the building was essentially completed in early September, 2008, but Greenwich decided to fire McBride and Kennedy and start over.

Prompt claim decisions are also the subject of *WAC 284-30-380. Standards for prompt, fair and equitable settlements applicable to all insurers,* which provides:

> (1) Within fifteen working days after receipt by the insurer of properly executed proofs of loss, the first party claimant shall be advised of the acceptance or denial of the claim by the insurer.

Greenwich failed to do this. If this timetable is impossible for the carrier to meet, it can use *WAC 284-30-370(3):*

> If the insurer needs more time to determine whether a first party claim should be accepted or denied, it shall so notify the first party claimant within fifteen working days after receipt of the proofs of loss giving the reasons more time is needed. If the investigation remains incomplete, the insurer shall, within forty-five days from the date of the initial notification and no later than every thirty days thereafter, send to such claimant a letter setting forth the reasons additional time is needed for investigation.

Greenwich Insurance Company failed to advise the insured of the reasons it refused to pay the claim. Greenwich told the insured that estimates were coming too slowly, "copied," or "out of whack." Greenwich refused to provide these estimates to the insured, so the insured had no way to understand why Greenwich was stalling. These regulations promote honesty and good faith by requiring meaningful communication. Greenwich did not communicate in a good faith manner.

Greenwich Insurance Company's claim file is not properly or fully documented, which violates *WAC 284-30-340:*

8

*WAC 284-30-340.* **File and record documentation.** The insurer's claim files shall be subject to examination by the commissioner or by his duly appointed designees. Such files shall contain all notes and work papers pertaining to the claim in such detail that pertinent events and the dates of such events can be reconstructed.

The claim file fails to document pertinent events, because important parts of the claim involved counsel, and Greenwich Insurance Company refuses to divulge information it deems privileged. Greenwich hired Mr. Penner very soon after the fire, and now uses his involvement to shield its shoddy claim practices from view. Doing so is bad faith under these circumstances because Greenwich Insurance Company may not adjust a claim in secret, or avoid the application of claim handling standards simply by hiring counsel. Greenwich Insurance Company and the Lims have a quasi-fiduciary relationship. Greenwich may not, without breaching that relationship, hide its actions from its policyholder.

**3. Common Law Bad Faith.** Greenwich Insurance Company failed to live up to its most basic quasi-fiduciary responsibility. The basic rule of good faith claim handling is that insurance companies must give the insured's interest equal consideration to its own interest. This is required because of the fiduciary nature of the relationship, and the unequal bargaining power of the parties. Greenwich Insurance Company failed to meet this basic requirement of good faith.

Equal consideration does not merely mean the insurance company should not cheat, lie or steal from its insured. Equal consideration means equal consideration. *The insurer should spend time and money to help the insured perfect and collect on the claim.* An insurance company must investigate in a balanced fashion. *The insurer must look for evidence that supports the policyholder's claim.* Spending more than a year looking for a low estimate is not balanced in any way, and is directly contrary to the insured's interest. *The insurer must work as hard for the Lim's benefit as it does for its own benefit.*

The insurer's investigation is paid for with premium dollars, which come from the policyholders. Greenwich Insurance Company must design and implement its investigatory and adjusting practices in a way which is evenhanded, not solely to benefit itself. Greenwich Insurance Company did not do that here. There is almost nothing in the claim file which evidences any concern for the policyholder. *Greenwich was concerned only with paying as little as possible.*

Greenwich took an unusual approach to the contents claim. After the appraisal, Greenwich applied a coinsurance penalty to the contents appraisal award. This was done despite the fact that Greenwich never reserved the coinsurance issue and had long waived it by the time of the appraisal. Greenwich has also not paid sales tax on ACV claims, despite a

9

recent Supreme Court decision which requires payment.

Another example of bad faith claim handling is found in Greenwich's approach to paying the undisputed portion of the building claim. Payment of undisputed claim amounts is required by the implied duty of good faith in the policy. The idea behind it is to get funds to the insured as soon as possible, to help the insured recover from the fire. If the carrier believes a certain number represents a proper claim amount, it should pay that number as soon as possible. Greenwich used an adjuster's estimate of $346,784 upon which to issue payment on December 29, 2008. The estimate had been in the file since October 8. The adjuster described the estimate:

> We have the initial adjuster's estimate for building damages from our new Independent Adjuster. This estimate is for $345,784.31. This is a preliminary estimate and is not an agreed scope of damages, has several open items and no code upgrades.

KC00487. Clearly, this estimate was for far less than the undisputed repairs to the building. In fact, at that time, the claim file contained estimates from contractors hired by Greenwich for $748,300, $743,107, $883,174, $728,878. There was no contractor estimate less than $728,878. These were some of the estimates Greenwich held secretly, and refused to share with the insured. It was unreasonable, bad faith, for Greenwich to base its undisputed payment on an artificially low estimate.

Greenwich had Business Interruption documentation in September, 2008. It forgot to work on the BI claim, and forgot to forward the documents to its own CPA, until early December. This created a two month delay in assessing the BI claim. Greenwich said it was Lim's fault the claim was delayed. Adjuster Cooper wrote to Greenwich's CPA on December 16, 2008:

> Can you reiterate to the insured?s CPA that you have been trying to obtain this information from the insured?s and they had not returned your calls. We have a DOI complaint coming on this one. I want to be sure that our position is clear as to the attempts to pay the BI portion of this loss. According to his email below, it sounds as if we have been delaying, instead of the insured not cooperating. Please call me if you have any questions.

Claim file, KC00449, KC00450. Cooper conveniently forgets that Greenwich sat on the BI claim for two months. Instead, Cooper blames the insured. This is bad faith claim handling. Greenwich's primary duty is to remember that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW 48.01.030.

This claim became an adversarial proceeding early in the claim process. This occurred because Greenwich refused to adjust and pay the claim in a prompt or reasonable fashion. Instead, Greenwich hired a lawyer so it could hide behind the privilege. Greenwich fired anyone who agreed with the insured and thus delayed resolution of the building claim.

Delay hurts policyholders. The Lims have been out of business since 2008 and will likely never recover from the fire. This is Greenwich's fault, and Greenwich delayed the claim intentionally. Delay favors the insurance company because vulnerable policyholders become financially unable to fight back.

## C. Conclusion.

Insurance companies owe policyholders certain duties which grow out of the nature of the insurer/insured relationship, and from the statutory and regulatory refinements of those duties. Claims adjusting is a service profession where claims professionals must provide prompt, fair, balanced and helpful services to first party claimants. That did not happen here.

## IV. Compensation

In this case, I am charging $300 per hour. I have spent about 25 hours on this case to date.

## V. Exhibits

The claim files may be used as trial exhibits.


Report Dated September 27, 2010


GARY WILLIAMS

11

**GARY WILLIAMS**
**Williams Law Office**
**252 Blueberry Hill Drive**
**Quilcene, WA 98376**
**360-765-0729**
**areyoucovered.com**


**Education**

Juris Doctor, 1979.  University of Puget Sound School of Law, Tacoma, Washington.
Bachelor of Arts, English, 1967.  Central Washington University, Ellensburg, Washington.
Associate in Claims, 1975.  Insurance Institute of America.


**Law Practice**

- Partner,  Smith and Williams, Tacoma, Washington, 1979-1984.  General civil and criminal trial practice.  Insurance defense.

- Partner,  Williams and Cushing, Tacoma, Washington, 1984-1987. Small litigation firm with insurance defense focus. Represented many insurers and their policyholders in auto, miscellaneous liability, coverage matters.

- Williams Law Office, Port Angeles, Washington, 1987-2002. Plaintiffs' and defense insurance and bad faith practice. Expert witness, mediator, appraiser.

- Williams & Tassie, Port Angeles, Washington, 2002-2005. Plaintiffs' and defense insurance and bad faith practice. Expert witness, mediator, appraiser.

- Williams Law Office, Quilcene, Washington, 2005-present. Plaintiffs' insurance and bad faith practice. Expert witness, mediator, appraiser.

Admitted to practice in Washington State and Federal courts since 1979.

Expert witness, 1990-present.  Serve as forensic expert in insurance coverage, bad faith, legal and insurance related professional liability cases.

Martindale-Hubbell rating Av.

1

## Insurance Claims Professional

- Adjuster, then Adjuster in Charge, Safeco Insurance Company, 1968-1971. Multiple line insurance claims handling. Attended Safeco claim school.

- Adjuster, American States Insurance Company, 1971-1975. Handled fire claims, larger casualty claims.

- Independent Adjuster, Western States Adjustment Services, 1975-1979. Larger fire and property claims, casualty claims for various insurance companies and self-insured entities. Attended law school during this period of time.

## Teaching

Pierce College, Tacoma, Washington, 1981-1983. Consulted to develop curriculum and taught courses in Insurance Claims Adjusting program.

University of Puget Sound School of Law, Tacoma, Washington. 1984-1987. Adjunct Instructor.

- Taught Legal Writing II, a second year appellate writing and oral argument course.

- Taught Comprehensive Trial Advocacy, a year long civil and criminal trial practice course.

- Coached National and Frederick Douglas moot court teams.

Peoples Law School, Washington State Trial Lawyers Association community outreach program. Taught insurance law, history of insurance.

Lecturer, Continuing legal education seminars. Trial practice, insurance law, claim practices and related topics. 1985 - present.

Chair, WSTLA Annual Insurance Law Seminar in Seattle and Spokane, Washington, 2001, 2010.

Faculty, National Institute for Trial Advocacy, 2003.

## Dispute Resolution

- Judge Pro-tem, Clallam County District Court, Port Angeles, Washington, 1993-1996.

- Arbitrator, in Clallam County Mandatory Arbitration Program, and in private insurance disputes, particularly underinsured motorist claims. 1984-present.

- Appraiser. Serve as appraiser in property insurance appraisal proceedings. 1985-present. These usually involve heavy damage to homes or businesses, and business interruption claims.

2

**Pro Bono Work**

- Chair, Pro Bono Committee, Pierce County Bar Association, Tacoma, Washington, 1983-1986.

- Founding Chair, Clallam County Pro Bono Program, 1991.

**Affiliations**

Washington State Bar Association, 1979-present.

Washington Association for Justice, 1979-present.

- Chair, Insurance Law Section, 2000-2001
- Member, Technology Committee, 1999-2004
- Member, Judicial Relations Committee, 2002-2005
- Teacher, Peoples Law School

American Bar Association, 1979-present. Tort and Insurance Practice Section.

American Association for Justice, 1979-present.

Defense Research Institute, 1980-1988.

Clallam County Bar Association, 1987-present. Past president.

Jefferson County Bar Association, 2007-present.

**Writings**

*Appraisal: Frequently Asked Questions.* Trial News, November, 2008.  Property insurance appraisal clauses are often misunderstood and misinterpreted. Common questions and issues.

*Avoiding Exclusion Pitfalls: The Purpose of Insurance Is to Insure.*  Washington State Trial Lawyers Association, Insurance Law Seminar, January, 2008.  Policy interpretation and construction can help the policyholder work around some common exclusions.

*How to Read an Insurance Policy.* Trial News, December, 2000.  Practical and legal tips on reading and understanding insurance policies.

*Litigating the Bad Faith Case.* A basic, beginner-level paper on prosecuting an insurance bad faith case in Washington state.  Presented to a King County Bar Association seminar.

*The Coventry Decision: A Sword for First Party Benefits?*  Discussion of *Coventry Associates*

3

*v. American States Insurance Company*, 136 Wn.2d 269, 961 P.2d 933 (1998). Written for a Washington Trial Lawyers Association seminar in 1999.

*The Good Claim File.* A tongue in cheek look at claim file mistakes. Written for the Fifth Annual Reed McClure Insurance Law Seminar.

*Fire Insurance Claims: Combating the Arson Defense*. Protecting the innocent insured from a false accusation of arson. Written for WSTLA Insurance Law Seminar, 2001.

*Examination Under Oath: Investigative Tool or Weapon of Mass Destruction*? Written for the auto insurance lawyer, this paper addresses the use of the examination under oath in UIM and PIP claims. 2001.

*Combating the Insurer's Fraud Defense*, an article published in TRIAL Magazine, in October, 1998.

*Is the Denial Reasonable Under IFCA? Read the Policy for the Answer*. Addresses the new Washington Insurance Fair Conduct Act in the context of penalties for unreasonably denying claims. Written for WSAJ nsurance Law Seminar, 2010.

*Proving Value in Homeowners Loss Claims: Strategies and Techniques for First Party Appraisals on Homeowners Coverage*. Written for WSAJ Insurance Law Seminar, 2010.

*Winning the Property Insurance Appraisal.* Trial Magazine, October 2009. Appraisal, from the standpoint of policyholder's counsel.

## Prior Testimony

This list represents my best effort at listing cases in which I have testified, at trial or deposition, as a retained expert witness. I may have forgotten one or two.

*McKenna Water District v. Chicago Title*, Pierce County Superior Court No. 03-2-138873. Deposition 4/24/2004. Trial testimony 3/2/2005.

*Pfeiffer v. Hartford*, King County Superior Court No. 02-2-16968. Deposition 8/14/2003.

*Beck v. Farmers*, Pierce County Superior Court No. 98-2-07851-6. Deposition 10/29/1999. Trial testimony 8/24/2000.

*Holt v. Farmers*, Pierce County Superior Court No.03-2-05724-5. Deposition 8/2004.

*Tooke v. Mutual of Enumclaw*, King County Superior Court No. 92-2-07030-8. Deposition 3/28/1994 and trial testimony approximately 9/2001.

*Underwood v. ANPAC*, King County Superior Court No. 00-2-11595-4 KNT. Deposition 6/12/2001. Trial testimony 1/21/2003.

*Chegini v. Farmers*, King County Superior Court, No. 99-2-26918-7SEA. Deposition 2/28/2001.

*Jackson v. Trustmark Insurance Company*, Pierce County Superior Court No. 00-2-07444-7. Deposition 3/6/2001.

*Allstate v. Huston*, Clark County Superior Court No. 99-2-00058-1. Deposition 1/3/2002. Trial testimony 2/14/2002.

*Giel v. Travelers*. King County Superior Court. Deposition 3/2001.

*Hanks v. Safeco*, Snohomish County Superior Court No. 92-2-03419-9. Deposition 12/13/1994.

*Homchick v. Allstate*. United States District Court, Western District of Washington, No. CO-5639-RJB. Deposition 8/19/2005.

*Zander v. New Hampshire Indemnity*, United States District Court, Western District of Washington, No. CO5-5154FDB. Deposition 5/3/2006.

*Grace Missionary Baptist Church v. GuideOne Insurance Co.*, Pierce County Superior Court No. 06-2-11029-9 Deposition May 28, 2008. Trial testimony January 20, 21, 2009.

*Wade vs. American Motorists Insurance*, King County Superior Court No. 08-2-26835-7. Deposition December 11, 2009.

**Rates and Fees**

Expert witness and consultation work is $350 per hour, $400 for testimony.

# EXHIBIT 2

# Michael R. Ruble, Ph.D.

**FINANCIAL AND ECONOMIC CONSULTANT**
1260 Thalen Drive
Lynden, WA 98264
Phone 360 354-8749, 360 920-4547

September 27, 2010

Michael Watkins
2825 Eastlake Avenue East
Suite 115
Seattle, Washington 98102

RE: Best Lynnwood Motor Inn

Dear Mr. Watkins,

In June 2010, I was engaged by your office to review documents associated with Best Lynnwood Motor Inn's insurance claim for their fire loss on August 10, 2008   My report focuses on the timing of the claim  payments by Greenwich Insurance Company (Greenwich) and the amount of the business interruption claim that was allowed.  I was provided with the following documents for my review listed in Exhibit 1.

## Timing of Payments on Building claim by Greenwich Insurance Company

In the first two months following the fire, Greenwich made two payments of $50,000 each. These were followed by a $174,955.75 payment on December 18, 2008 and an $82,863.28 payment on March 10, 2009 for cumulative payments of $357,819.03 through March 2009.  The last two payments totaling $297,953.30 were not paid until March 22, 2010 (see payment schedule at Exhibit 2 and timeline at Exhibit 3).  The timing of these payments was a major factor in the Lim's delaying reconstruction of the Best Lynnwood Motor Inn (Motor Inn) until March 2010.  If Greenwich would have been more timely in the determination of the loss, which was not made until November 12, 2009 (see exhibit 4), construction could have started much early.

In addition, the delay of the determination of the award and the beginning of reconstruction caused the Lim's to incur business and personal expenses[1], which diverted their capital away from the reconstruction.  As a result, the Lim's were unable to afford the full rebuild as envisioned in the appraisal award and described by the report from Pacific Engineering Technologies.

The construction delay also led to increased business losses as the Motor Inn operated at partial capacity from the date of the fire to March 2010 and has been completely shut down since the start of reconstruction.  The financial impact of this will be discussed in a later section of this report.

1. Mrs. Lim continues to gather this information for my review, which will likely be used to amend this report prior to trial.

Best Lynnwood Motor Inn
Page 2

<u>Timing of Payments on Business Personal Property claim by Greenwich Insurance Company</u>

Payments on the Business Personal Property portion of the claim were also delayed with the first $25,000 payment coming 6 months after the fire and the last payments totaling $34,657.16 paid March 22, 2010, more than 19 months after the fire.

As with the building claim payment delay, the Lim's were forced to divert capital for business and personal expenses away from the construction rebuild and replacement of business personal property.

The financial impact of this delay is still being determined with an amended report likely prior to trial.

<u>Timing of Payments on Business Interruption claim by Greenwich Insurance Company</u>

Like the Business Personal Property claim payments, the first payment $75,000 on the Business Interruption (BI) portion of the claim was not paid until 6 months after the fire, in spite of a preliminary report from Don Smith dated September 25, 2008. An additional payment of $38,745.60 was made on April 24, 2009. The final payments totaling approximately $119,000 were made in three payments in March, April and May 2010. The appraisal award of $189,000 for a 9 month reconstruction rebuild was not made until April 27, 2010 more than 20 months after the fire.

As with the building and business personal property claim payment delays, the Lim's were forced to divert capital for business and personal expenses away from the construction rebuild and replacement of business personal property.

The financial impact of this delay is still being determined with an amended report likely prior to trial.

<u>Business Interruption Award and Business Income Loss</u>

As mentioned above, the delay in the determination of the building award and claim payments caused the Lim's to delay the reconstruction of the Motor Inn until March 2010 with final completion in late September or early October with a Motor Inn reopening in mid to late October 2010. As a result, the Motor Inn will have operated partially for 19 months and not at all for 7 months.

With the $189,000 Business Interruption Award for 9 months (See Exhibit 4), it seems that lost business income continued on for another 18 months and should be valued at least at $378,000 pending a full accounting of the actual business operations of the Motor Inn from the date of the fire to its actual reopening and a few months beyond as it rebuilds its client base.

In conclusion, it appears that as a result of the delay in the determination and payment of damages, the Lim's incurred business and person expenses of a yet to be determined amount that diverted their capital away from the Motor Inn reconstruction. Also the delayed determination and payment significantly increased the business income loss suffered by the Motor Inn as a result of the August 10, 2008 fire.

Sincerely,

Mike Ruble

Michael R. Ruble

Best Lynnwood Motor Inn

Page 3

Exhibit 1 List of Reviewed Documents      .

Copy of insurance policy #636000229-01 underwritten by Greenwich Insurance Company with MK LIM, Inc., DBA: Best Lynnwood Motor Inn as the insured dated July 16, 2008 covering the period from 7/14/2008 to 7/14/2009.

Appraisal Award Building dated November 12, 2009 (**Exhibit 4**)

Appraisal Award Business Personal Property dated February 5, 2010 (**Exhibit 4**)

Appraisal Award Business Interruption dated April 27, 2010 (**Exhibit 4**)

Schedule of Payments on claim 2008-4091-63 (**Exhibit 2**)

Undated and unsigned valuation report of building replacement cost and actual cash value

JCL Construction, Inc. bill for emergency roof repairs

Washington Alarm Service bill for alarm repairs following fire

Estimate of repair work necessary on building prepared by Pacific Engineering Technologies dated April 29, 2009

C. Scott Penner letter of March 1, 2010 to Roger Howson and John Colvard regarding Business interruption loss

CV of C. Donald Smith

Reports regarding Business Interruption Loss

Report of Quintana, Lopez, Donoghue & Gonzalez, LLP dated February 11, 2010

Report of Smith & Co., LLC dated September 25, 2008

Report of Smith & Co., LLC dated February 2, 2010

Report of Smith & Co., LLC dated March 9, 2010 (12 month period)

Report of Smith & Co., LLC dated March 10, 2010 (9 month period)

Smith & Co response to Report of QLDG and QLDG's comments on Smith & Co. report

Best Lynnwood Motor Inn
Page 4

Exhibit 2 Schedule of Payments on Claim 2008-4091-63

Business Personal Property

| Date | Amount | Cumulative Amount |
|------|--------|-------------------|
| 2/9/2009 | 25,000.00 | |
| 3/1/2010 | 13,286.94 | 38,286.94 |
| 3/1/2010 | 14,459.86 | 52,746.80 |
| 3/19/2010 | (13,286.94) | 39,459.86 |
| 3/19/2010 | (14,459.86) | 25,000.00 |
| 3/22/2010 | 18,338.18 | 43,338.18 |
| 3/22/2010 | 16,318.98 | 59,657.16 |

Building

| Date | Amount | Cumulative Amount |
|------|--------|-------------------|
| 8/21/2008 | 50,000.00 | |
| 10/6/2008 | 50,000.00 | 100,000.00 |
| 12/18/2008 | 174,955.75 | 274,955.75 |
| 3/10/2009 | 82,863.28 | 357,819.03 |
| 10/13/2009 | 5,470.67 | 363,289.70 |
| 3/1/2010 | 115,414.62 | 478,704.32 |
| 3/1/2010 | 182,538.68 | 661,243.00 |
| 3/19/2010 | (115,414.62) | 545,828.38 |
| 3/19/2010 | (182,538.68) | 363,289.70 |
| 3/22/2010 | 115,414.62 | 478,704.32 |
| 3/22/2010 | 182,538.68 | 661,243.00 |

Business Interruption

| Date | Amount | Cumulative Amount |
|------|--------|-------------------|
| 2/9/2009 | 75,000.00 | |
| 4/24/2009 | 38,745.60 | 113,745.60 |
| 3/1/2010 | 15,100.13 | 128,845.73 |
| 4/30/2010 | 60,154.27 | 189,000.00 |
| 5/25/2010 | 43,750.00 | 232,750.00 |

Best Lynnwood Motor Inn
Page 5

Exhibit 3 TimeLine of Events

| Event | Date | | Building | Business Personal Property | Business Interruption |
|---|---|---|---|---|---|
| Fire | 8/10/2008 | | | | |
| Payment #1 Bldg. | 8/21/2008 | | (50,000.00) | | |
| Payment #2 Bldg. | 10/6/2008 | | (50,000.00) | | |
| Payment #3 Bldg. | 12/18/2008 | | (174,955.75) | | |
| Payment #4 BPP | 2/9/2009 | | | (25,000.00) | |
| Payment #5 BI | 2/9/2009 | | | | (75,000.00) |
| Payment #6 Bldg | 3/10/2009 | | (82,863.28) | | |
| Payment #7 BI | 4/24/2009 | | | | (38,745.60) |
| Payment #8 Bldg. | 10/13/2009 | | (5,470.67) | | |
| Appraisal Award  Bldg | 11/12/2009 | 912,682.81 | | | |
| Appraisal Award  BPP | 2/5/2010 | 76,781.22/134,769.00 | | | |
| Payment #9 BI | 3/1/2010 | | | | (15,100.13) |
| Payment #10 BPP | 3/22/201 | | 0 | (18,338.18) | |
| Payment #11 BPP | 3/22/2010 | | | (16,318.98) | |
| Payment #12 Bldg | 3/22/2010 | | (115,414.62) | | |
| Payment #13 Bldg | 3/22/2010 | | (182,538.68) | | |
| Reconstrucion begins March 2010 | | | | | |
| Appraisal Award  BI | 4/27/2010 | 189,000/262,000/43,750 | | | |
| Payment #14 BI | 4/30/2010 | | | | (60,154.27) |
| Payment #15 BI | 5/25/2010 | | | | (43,750.00) |
| Reconstruction completed | Sept./Oct. 2010 | | | | |
| Motor Inn reopens | October /November 2010 | | | | |
| Total Payments | | | (661,243.00) | (59,657.16) | (232,750.00) |

Best Lynnwood Motor Inn
Page 6

Exhibit 4 Appraisal Awards

Business Personal Property Appraisal Award
At date of loss (August 10, 2008)

| Replacement Cost | Actual Cash Value | Payments to-date |
|---|---|---|
| 76,781.22 | 49,462.90 | 59,657.16 |

At date of appraisal (February 5, 2010)

| Replacement Cost | Actual Cash Value |
|---|---|
| 134,769.00 | 83,322.93 |

Building Appraisal Award (November 12, 2009)

| | Replacement Cost | Actual Cash Value | Payments to-date |
|---|---|---|---|
| Structure Repairs | 655,861.81 | 473,323.13 | 661,243.00 |
| Structure (Code) | 255,910.48 | | |
| Structure (Mold) | 910.52 | 910.53 | |
| Total Building Claim | 912,682.81 | 474,233.66 | |

Business Interruption  Appraisal Award (April 27, 2010)

| | | Payments to-date |
|---|---|---|
| For 9 months | 189,000 | 189,000.00  plus 43,750 loan extension |
| For 12 months | 262,000 | |