1

**HONORABLE MARSHA J. PECHMAN**

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8

9

| | |
|---|---|
| MK LIM, INC., DBA BEST LYNNWOOD MOTOR INN, a Washington corporation,, | **CIVIL ACTION NO. C10-cv-00374 MJP** |
| Plaintiff, | **DEFENDANT GREENWICH INSURANCE COMPANY'S SUPPLEMENTAL FRCP 26(a)(2) DISCLOSURE OF EXPERT TESTIMONY** |
| vs. | |
| GREENWICH INSURANCE COMPANY, an insurance company | |
| Defendant. | |

10

11

12

13

14

15

16

17       Pursuant to the Court's Minute Order Setting Trial Date & Related Dates ("Scheduling

18   Order"), dated May 4, 2010 and filed as Docket No. 10, Defendant Greenwich Insurance

19   Company ("Greenwich") produces the attached expert reports for the following expert

20   witnesses:

21   **1.    Kit Bratlien**
            **Bratlien Martinsen Company**
22          **4437 Lake Washington Blvd NE**
            **Suite 202**
23          **Kirkland, WA 98033**
            **(206)686-4500**
24

25       Mr. Bratlien is expected to testify as to the scope of damage to the Best Western

26   Motor Inn caused by the fire that is the basis of Plaintiff's claim, the costs related to repair or
     replacement of damaged building components, the reasonableness of Greenwich's requests

1   for estimates and scope of repair in the course of calculating the structure loss, the
2   reasonableness and adequacy of the various estimates provided to Greenwich in light of
    applicable industry norms, customs, and practices, and timeline and scheduling issues related
3   to calculation of the structure loss.

4        Please see Mr. Bratlien's report attached hereto as Exhibit 1.  Pursuant to FRCP
    26(a)(2)(D), Greenwich reserves its right to supplement Mr. Bratlien's report and opinions as
5   previously unknown information is disclosed during discovery.

6   **2.      Paul C. Sutphen, CPA/CFF, CFE**
            **Partner**
7           **RGL Forensics**
            **600 Stewart Street, Suite 1800**
8           **Seattle, WA  98101**
            **(206)682-6500**
9

10       Mr. Sutphen is expected to testify as to the reasonableness, in light of applicable
11  industry norms and standards, of the various requests, calculations, communications, acts and
    alleged omissions on the part of Greenwich and its agents in calculating the business income
12  loss, as well as the time period required to calculate that loss.  He may also offer testimony to
    rebut the testimony of Plaintiff's expert witnesses regarding the nature and extent of the
13  economic losses alleged to be suffered by Plaintiff as a result of the alleged wrongful acts and
    omissions of Greenwich and its agents.
14

15       Please see Mr. Sutphen's report attached hereto as Exhibit 2.  Please also see the
    notebook containing the documents referenced in Exhibit A to Mr. Sutphen's report, a copy of
16  which has been served on Plaintiff's counsel on the date of this filing, and on which Mr.
    Sutphen intends to rely as an exhibit at trial.  Pursuant to FRCP 26(a)(2)(D), Greenwich
17  reserves its right to supplement Mr. Sutphen's report and opinions as previously unknown
    information is disclosed during discovery.
18

19  **3.      Danette Leonhardi, MBA**
            **Puget Sound Environmental Claim Consulting, LLC**
20          **3635 Fremont Ave North #407**
            **Seattle, WA  98103**
21          **(206)251-2598**

22       Ms. Leonhardi is expected to testify as to the reasonableness of Greenwich and its
23  agents in the investigation and handling of the Lim claim based on the applicable insurance
    industry standard of care, including standard of care applicable to insurers and adjusters
24  adjusting insurance claims in the State of Washington.

25       Please see Ms. Leonhardi's report attached hereto as Exhibit 3.  Pursuant to FRCP
26  26(a)(2)(D), Greenwich reserves its right to supplement Ms. Leonhardi's report and opinions
    as unknown information is disclosed during discovery.

**DEFENDANT GREENWICH INSURANCE**
**COMPANY'S SUPPLEMENTAL FRCP 26(a)(2)**
**DISCLOSURE OF EXPERT TESTIMONY**
**C10-cv-00374 MJP**
**Page 2**

LAW OFFICES
**BENNETT BIGELOW & LEEDOM, P.S.**
1700 Seventh Avenue, Suite 1900
Seattle, Washington  98101
T: (206) 622-5511 / F: (206) 622-8986

1    Pursuant to the Scheduling Order, Greenwich reserves its right to disclose
2    supplemental expert witnesses and produce supplemental expert witness reports by November
3    29, 2010. Such supplemental expert witnesses may include, but not be limited to, Karen
4    Weaver, previously disclosed by Greenwich.

5    Greenwich reserves the right to supplement this disclosure as further discovery
6    warrants.

7    Greenwich also reserves the right to call at the time of trial any witnesses identified by
8    Plaintiff.

9    RESPECTFULLY SUBMITTED this 27th day of October, 2010.

10                                          BENNETT BIGELOW & LEEDOM, P.S.

11

12    By /s/ Timothy E. Allen
      William J. Leedom, WSBA #2321
13    Timothy E. Allen, WSBA #35337
      Attorneys for Defendant Greenwich
14    Insurance Company

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT GREENWICH INSURANCE
COMPANY'S SUPPLEMENTAL FRCP 26(a)(2)
DISCLOSURE OF EXPERT TESTIMONY
C10-cv-00374 MJP
Page 3

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511 / F: (206) 622-8986

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on October 27, 2010, I electronically filed the foregoing **(1)**

3

**Defendant Greenwich Insurance Company's Supplemental FRCP 26(a)(2) Disclosure of**

4

**Expert Testimony,** and **(2) this Certificate of Service**, with the Clerk of the Court using the

5

6

CM/ECF system which will send notification of such filing to the following: Michael T.

7

Watkins, Law Offices of Michael T. Watkins, 2825 Eastlake Ave E Ste 115, Seattle, WA

8

98102-3084, michael@mtwlawfirm.com, Attorneys for Plaintiff.  I also certify that I caused

9

to be served upon Mr. Watkins by means of legal messenger a notebook containing the

10

documents referenced in Exhibit A to the expert report of Paul Sutphen, upon which Mr.

11

Sutphen intends to rely as an exhibit at trial.

12

BENNETT BIGELOW & LEEDOM, P.S.

13

14

By /s/ Timothy E. Allen
Timothy E. Allen, WSBA #35337

15

Attorneys for Defendant Greenwich
Insurance Company

16

17

18

19

{1929.00021/M0237015.DOC; 1}

20

21

22

23

24

25

26

**DEFENDANT GREENWICH INSURANCE
COMPANY'S SUPPLEMENTAL FRCP 26(a)(2)
DISCLOSURE OF EXPERT TESTIMONY
C10-cv-00374 MJP
Page 4**

# EXHIBIT 1

October 22, 2010

Report of Expert Consultation Witness:

<div align="center">

Christian T. "Kit" Bratlien, President
BRATLIEN MARTINSEN COMPANY
4437 Lake Washington Boulevard, Suite 202
Kirkland, WA, 98033

</div>

Re:      *MK Lim, Inc., DBA Lynnwood Motor Inn, v. Greenwich Insurance Company*

This plaintiff in this matter asserts a claim of Bad Faith on the part of the above stated insurance company, Greenwich Insurance Company ( Greenwich ), in United States District Court of Washington No.C10-cv-00374MJP.  The matter concerns a fire which occurred on August 10, 2008, resulted from an arson act, during which the insured's property experienced damage from both fire and smoke. There is a considerable difference of opinion concerning the scope of necessary repairs to repair the property to the existing condition at the time immediately prior to the loss. The property insurance policy purchased by the insured, Mr. MK Lim, DBA Lynnwood Motor Inn, included provisions to repair the property in accordance with the currently applicable municipal Building Codes and Ordinances in the event the property was damaged by a covered event.  The policy also contains certain provisions governing the payment of funds to the insured based on the valuation of the damages, the commencement of repairs and financial impact experienced during the period of business interruption.

Greenwich retained the services of an independent claims adjusting service, Precision Risk Management ( PRM ), to manage the claim process of this matter. PRM was tasked to adjust and settle the building property, building contents and business interruption aspects pertaining to this claim. In order to accomplish this, PRM routinely engages building contractors and other professional estimating services to perform site inspections, scope of work assessments and cost of repair estimates to assist the claim settlement process with the insured.  PRM retained the services of Washington Oregon Claims Service ( WOCS ) to develop a scope of repair and cost estimate for settlement purposes in this matter.

At the same time, the insured retained the services of an independent  public adjuster to represent them in the claims process. Public adjusters become involved in a small percentage of the claims settled with insurance companies because they charge a fee for their services, which is usually paid out of the claims proceeds. Insured's utilize these professionals for a variety of reasons, but mainly due to unfamiliarity with the settlement

process, prior bad experience with the process or distrust of insurance companies. Whatever the reason, the insured in this matter hired Allwest Adjusters to represent them in this case.

A site visit was conducted for the purpose of determining the severity of damages and the required scope of repair. WOCS presented the initial repair estimate for Greenwich, dated 8-28-08 in the amount of $443,434. The estimate included an allowance of $10,000 to include the installation of a possible code related fire sprinkler system. Allwest Adjusters hired ALLPRO Construction Inc. to provide a comparative scope and cost. This initial estimate, dated 9-3-08, was presented in the amount of $481,636.64. Although the prices seemed relatively close, the scopes of work represented significant differences in agreement.

In order to standardize the settlement process and provide a consistent format for claims evaluation, some insurance companies have adopted and subscribe to an estimating system developed by industry leaders commonly known as the Exactimate system. This system is widely used by insurance companies, contractors and consulting professionals to generate cost estimates for most components commonly used in repair / renovation construction projects. It is especially suited to pricing the cost of repairs to partial losses in which severe damages are minimal and isolated to specific areas within a building, with the remaining premises relatively intact.

Such is the case with the building in this matter.  The severe fire damage was limited to four of the 34 rooms comprising this property. The remaining rooms experienced light to moderate smoke damage not in excess of what could be cleaned provided the restoration work commenced without prolonged delay.

**Scope of Damages**

From the beginning there was no concurrence between the insured and Greenwich's consultants regarding the scope of damages. Simply stated, the insured maintained the position that all of the interior finishes of the entire building required removal and replacement. This included drywall throughout the building, even in areas where the smoke residue was minor, and insulation located within the walls that had no contact with outside air, which could transfer particulate.  Greenwich maintained the area outside of the severely damaged rooms could be cleaned, sealed and repainted rather than being demolished and reinstalled.

PRM hired a second consultant, Carwood Claims Service, to provide a check of the WOCS estimate. The second estimate was received on 9-18-08, in the amount of $346,744, which corroborated the WOCS's  previous figure of $443,434 as substantively high. A week later, ALLPRO revised their initial estimate up from $481,636 to a new total of $799,655. This second estimate from ALLPRO included complete removal and replacement of the exterior stucco cladding as well as replacement of all of the windows in the building because of matching issues.

Another round of estimates were prepared by both the insured and Greenwich in mid to late October. PRM hired a third consultant, Alliance Restoration, resulting in a bid of $748,339. Carwood also provided a third estimate, revising their scope and price to $607,478. The insured's contractor revised their bid to $961,777, by raising the electrical bid by $68,430 and adding a new item, Landscaping, in the amount of $55,630. Refer to the attached **Exhibit A** for detailed comparisons and a chronology of the estimates prepared.

As the comparative scope of work and price differences between the insured and Greenwich were becoming greater rather than smaller, PRM decided to hire Alliance Restoration Services, Inc. to perform additional estimating and scope review. This resulted in additional estimates of 10/31/08 and 11/13/08, in the amounts of $743,107 and $728,878 respectively. Carwood also provided and additional estimate of 12/21/08, in the amount of $736,915, which included an amount of $116,959 for business personal property ( contents ). No further estimates were received from the insured's contractor during this time. They remained firm on their last estimate of 10/28/08 in the amount of $961,777, although the there was no agreement that their scope of work was representative of the damages.

There continued to be no agreement among the parties concerning the proper scope of work. Some estimates included content items that were separately scheduled while others did not. In an attempt to establish an agreed upon scope of work, PRM hired Pacific Engineering Technologies, Inc. ( PET ) to perform a damage assessment and develop a, independent scope of repair. PRM also hired a fourth independent contractor, Nordic Services, Inc., to assess the damage and provide a cost estimate, based on the PET repair scope. The PET plans and specifications listing the required repair work, including code compliance scope additions, were prepared and presented to the parties on April 29, 2009. Again, there was no acceptance of this independent scope by the insured's adjuster.

Nordic Services Inc. provided an initial estimate, in the amount of $1,055,317 on 6/12/09. It included some mistakes concerning scope issues and did not follow the work items listed in the PET specifications. Nordic provided four revisions of the initial estimate during the next five weeks, breaking down the price according to the separate work related to building repair, code upgrade items, and mold remediation subtotals. The Nordic bids were rejected as non-responsive because they continued to differ from the PET scope and continued to include uncorrected errors, duplications and items that were not associated with the repair.

As it became apparent the Nordic estimate was faulty, during the five week revision period, PRM retained Lorentz Bruun Construction to provide a bid based on the PET scope of work. The Bruun estimate was submitted on 7/21/09 in the amount of $826,796, including provisions for code upgrades and mold remediation. The insured's adjuster also hired another independent contractor, Charter Construction, to provide a comparative estimate based on the PET scope. Although Charter did not perform their own independent estimate, they accepted the Bruun baseline estimate of $633,851.94 and then added nine revisions to arrive at a marked-up total of $954,396. Bruun reviewed the

suggested Charter revisions and revised their final 11/6/09 estimate to $884,476. The difference between repair estimates was narrowed to approximately $70,000 as a result of the latest effort.

## Cost of Repairs

The cost aspects of this matter are driven exclusively by the scope of work. The Exactimate pricing system provides the unit prices to be applied to the line item quantities resulting from the scope calculations. Differences in the quanties were significant in this matter as the initial estimates took diverging approaches to the repair requirements. The significant differences in the estimates were based on quantity assessments, repair versus replace considerations, and subcontractor pricing. The consensus of the scope of repairs remained in contention up and through the final estimates that were presented.

Once the quantity factors were established, the main pricing issues were limited to subcontractor quotes for electrical, flooring materials, fire protection systems, windows and exterior plaster systems. Together with the code related items, these activities comprised the bulk of the cost differential. Inclusions of non-damaged items such as Landscaping, in the amount of $73,098 after mark-ups, contributed to the inability to achieve a consensus on the repair cost in this matter. It is my opinion that the cost of repair associated with the Bruun estimate of 11/6/09 is representative of the reasonable cost of repair for this loss. The earlier versions of the estimate would have to be adjusted to include the code related issues to be meaningful in comparison.

## Estimate Timeline

During the 15 month scope and estimate preparation for this matter, a total of twenty estimates or revisions were reviewed by eight different entities, five of which were contractors specializing in the fire restoration business. This period should be unwarranted given that this is a relatively simple matter concerning identification of the damages, development of a repair scope of work and pricing the various items associated with the scope. Normally, this process is finalized in the early stages of a casualty loss as the parties are interested in moving on with repairs and getting back in business. It requires a cooperative effort, involving industry professionals, acting both responsively and responsibly in measuring the damages and pricing the repairs. Adversarial relationships have the effect of bringing meaningful dialogue to an abrupt standstill as the parties in such a case proceed with caution, skepticism and distrust rather than cooperation, open mindedness and a spirit of fairness.

The inability for the parties to achieve immediate consensus on the basic scope of work, resulted in stymieing the repair effort and prolonging the entire resolution process. In most cases similar to this matter, repairs commence long prior to the complete resolution of the cost aspects. This is due to business factors, mitigation concerns and the ongoing operational costs of being out of production. In the instant matter, decisions were made to postpone repairs until a final resolution was achieved among the parties.

The timeline was further unduly prolonged due to the lack of response from the contractors requested to provide bids. Unless the contractors perceive they have a chance to win the award and perform the repairs, they may not take the time to prepare a meaningful estimate. As was the case with Nordic Services which response contained significant errors and excess pricing while remaining unresponsive to the written scope of repair prepared by PET.  A review of the attached estimate summary demonstrates these errors.

Greenwich's requests for independent estimates from contractors may have been hampered due to the involvement of a public adjuster in this matter. Contractors perceive there is little, if any, chance they will be awarded the repair contracts since there is no formal bid process or compensation if they are not successful. This leads to non-responsive estimates wherein the contractor add significant contingency to the estimates.

## Conclusion

The settlement process in this matter was prolonged by a variety of circumstances and events, most notably the inability of the parties to reach agreement concerning the reasonable and necessary repairs to restore the property to the pre-fire condition, subject to policy provisions concerning code and ordinance compliance. The adversary relationship resulting from these differences and the inability to resolve them, created a sense of distrust and caused the parties to develop an unreasonably cautious approach to the claims process. Greenwich's adjustment consultant experienced difficulty in achieving any meaningful dialogue with the public adjuster and was frustrated by repeated poor performance on the part of their construction cost consultants in adhering to a specific scope of work.

From the materials I reviewed in developing my opinions, I do not see any justification for the assertion of bad faith on the behalf of Greenwich, their adjusters or their cost consultants. Rather, it appears that Greenwich encountered difficulty in achieving anything other than an adversarial relationship with the public adjuster representing the insured and was prejudiced by poor quality work by their cost consultants. My review concludes that Greenwich's adjustment team adhered closely to the policy provisions and advice of counsel in dealing with a needlessly difficult claim.

Christian T. Bratlien

In forming my opinions in this matter I have reviewed the following documents:

1.   Various pleadings, disclosures and motions to the court.

2.   Contents inventory of business personal property
3.   Property Loss Reports
4.   Claim Activity Notes – XL Insurance
5.   Pacific Engineering Technologies, Inc. – Written Scope of Work, April 28, 2008
6.   Multiple Estimates prepare by Consultants and Contractor – See Exhibit A
7.   Various emails ( redacted), letters, correspondence and notices chronological
      arranged from  Sep 2008 through April 2010
8.   Fire Investigation Report – Lynnwood Fire Department
9.   Photographs of each room and exterior elevations
10. Servicemaster Estimate  8/28/08
11. Various Subcontractor Quotes and Proposals
12. Proof of Loss 10/30/08
13. Request for Appraisal
14. Appraisal Award w/ Schedules
15. Complaint in Superior Court 1/29/10
16. Coinsurance Summary
17. Bruun Contents Estiomate
18. CoinsuranceValuation Method 2/8/10

Attached is Exhibit A – Chronological Estimate Summary

**Witness Qualifications:**

I am President of Bratlien Martinsen Company, an independent consulting firm specializing in construction cost estimating, quantity surveys, scheduling and project management.

I was the majority owner in Wick Constructors, Inc, a  large general contractor serving the Pacific Northwest and Alaska from 1987 through 2007.

I  have testified in Federal and State courts in Washington, Wisconsin and California. I have testified in the matters listed in Exhibit B attached hereto during the last four years.

I have been retained by defendant attorney, Tim E. Allen of  the law firm Bennett Bigelow and Leedom, P.S. on the behalf of Greenwich Insurance Company for the purpose of providing expert opinion regarding bad faith in this matter.

My hourly compensation for work related to this matter is $150 per hour.

# EXHIBIT A

EXHIBIT A

Recap by Category - Estimate Summary

| Description | Est. # 1 WOCS 8/29/08 | Est. # 2 ALLPRO 9/3/08 | Est. # 3 Carwood 9/18/08 | Est. # 4 ALLPRO 9/26/08 | Est. # 5 Alliance 10/15/08 | Est. # 6 Carwood 10/16/10 | Est. # 7 ALLPRO 10/28/08 | Est. # 8 Alliance 10/31/08 | Est. # 9 Alliance 11/13/08 |
|---|---|---|---|---|---|---|---|---|---|
| Appliances | 3,183.56 | 2,432.22 | | 2,432.22 | No Detail | 10,970.58 | 2,432.22 | No Detail | No Detail |
| Cleaning | 15,256.85 | | 19,938.69 | 1,500.00 | | | 1,500.00 | | |
| Contents Manipulation | | | 5,825.60 | | | | | | |
| Cabinetry | | 11,685.07 | | 11,685.07 | | | 11,685.07 | | |
| Contents, Soft Goods Clean | | | | | | | | | |
| Concrete / Asphalt | | | | | | | | | |
| General Demolition | 28,449.23 | 48,275.00 | 21,975.55 | 48,275.00 | | 55,672.90 | 48,275.00 | | |
| Doors | 31,791.04 | 15,102.66 | 10,234.88 | 15,349.25 | | 9,936.00 | 15,349.25 | | |
| Drywall | 30,676.02 | 91,742.46 | 28,131.46 | *109,426.80* | | 74,084.44 | *109,426.80* | | |
| Electrical | 12,320.82 | 13,470.58 | 869.92 | *87,321.58* | | 46,600.00 | *155,751.58* | | |
| Elec - Special Systems | | | | | | | | | |
| Floor Covering - Carpet | 23,610.69 | 25,744.42 | 31,630.32 | 27,394.10 | | 31,904.78 | 27,394.10 | | |
| Floor Covering - Vinyl | 6,273.29 | 20,399.03 | 6,446.60 | 20,491.76 | | 32,985.77 | 20,491.76 | | |
| Permits and Fees | 4,000.00 | | | | | | | | |
| Finish Carpentry / Trim | 2,677.08 | 2,870.13 | | 3,849.33 | | | 3,849.33 | | |
| Finish Hardware | 1,808.24 | 7,486.98 | 3,645.64 | 7,553.71 | | 7,143.66 | 7,553.71 | | |
| Fire Protection Systems | 10,000.00 | | | | | | | | |
| Framing / Rough Carp | 318.80 | | 2,904.65 | 897.70 | | 3,222.20 | 897.70 | | |
| HVAC | 7,408.00 | 1,640.16 | 28,585.76 | 1,640.16 | | 28,585.76 | 1,640.16 | | |
| Insulation | 10,978.94 | | 9,799.39 | 11,582.41 | | 6,652.98 | 11,582.41 | | |
| Labor Only | 24,776.00 | | | | | | | | |
| Light Fixtures | 5,030.24 | 11,387.20 | 5,144.14 | 12,454.83 | | 5,202.80 | 12,454.83 | | |
| Landscaping | | | | | | | *55,630.00* | | |
| Misc Equipment - Comm | | | | | | | | | |
| Mirrors and Shower Door | 498.84 | 354.60 | 1,858.92 | 354.60 | | 1,858.92 | 354.60 | | |
| Plumbing | 22,484.40 | 44,498.59 | 8,843.50 | 61,815.50 | | 10,968.37 | 61,815.50 | | |
| Paneling and Wood Wall Sys | | | | | | | | | |
| Painting | 58,337.75 | 68,986.16 | 67,450.65 | 68,757.26 | | 85,469.45 | 68,757.26 | | |
| Roofing | 8,358.44 | | 4,718.06 | 18,510.00 | | 14,154.18 | 18,510.00 | | |
| Scaffolding | 4,173.92 | | | 11,965.28 | | 8,772.80 | 11,965.28 | | |
| Soffit, Fascia & Gutter | | | | 980.00 | | | 980.00 | | |
| Stucco / Exterior Plaster | 17,881.00 | | 5,330.05 | 64,552.41 | | 21,645.95 | 64,552.41 | | |
| Tile | | | | 1,311.07 | | | 1,311.07 | | |
| Specialty Items | | | | | | | | | |
| Steel Joists | | | | | | | | | |
| Tempoary Repairs | 415.00 | 1,660.00 | 815.88 | 1,660.00 | | 2,804.94 | 1,660.00 | | |
| Windows - Aluminum | 2,064.16 | | 1,219.25 | 12,232.00 | | 1,903.72 | 12,232.00 | | |
| Window Treatment | 5,827.60 | 2,826.60 | | 7,926.60 | | 8,319.25 | 7,926.60 | | |
| Windows - Vinyl | 817.58 | | | | | | | | |
| Water Extraction ... | | | | | | | | | |
| General Items | | | | | | | | | |
| Subtotal | 339,017.47 | 368,561.86 | 265,369.09 | 611,918.64 | 572,124.65 | 464,859.45 | 735,978.64 | 568,124.65 | 557,246.40 |
| Overhead @ 10% | 33,901.75 | 36,856.19 | 26,536.91 | 61,191.86 | 57,212.47 | 46,485.95 | 73,597.86 | 56,812.47 | 55,724.64 |
| Profit @ 10% | 33,901.75 | 36,856.19 | 26,536.91 | 61,191.86 | 57,212.47 | 46,485.95 | 73,597.86 | 56,812.47 | 55,724.64 |
| O & P Items Subtotal | 406,820.96 | 442,274.23 | 318,442.91 | 734,302.37 | 686,549.58 | 557,831.34 | 883,174.37 | 681,749.58 | 668,695.68 |
| Non-O&P Items | | | | | | | | | |
| BPP | | | | | | | | | |
| Fire Protetion System | | | | | | | | | |
| Electrical | | | | | | | | | |
| Non-O&P Subtotal | | | | | | | | | |
| WSST @ % varies | 36,613.89 | 39,362.41 | 28,341.42 | 65,352.91 | 61,789.46 | 49,646.99 | 78,602.52 | 61,357.46 | 60,182.61 |
| Total | 443,434.85 | 481,636.64 | 346,784.33 | 799,655.28 | 748,339.04 | 607,478.33 | 961,776.89 | 743,107.04 | 728,878.29 |
| Tax Rate Applied | 9% | 8.90% | 8.90% | 8.90% | 9% | 8.90% | 8.90% | 9% | 9% |
| Floor Area - sf | 8,892 | 8,808 | 9,019 | 9,057 | 9,121 | 9,019 | 9,057 | 9,121 | 9,121 |
| Wall Area - sf | 30,873 | 33,427 | 36,085 | 40,221 | 37,186 | 35,767 | 40,221 | 37,186 | 37,188 |
| Ceiling Area - sf | 8,892 | 8,808 | 9,406 | 9,057 | 9,121 | 9,406 | 9,057 | 9,121 | 9,121 |

| Description | Est. #10 Carwood 12/21/08 | Est. #11 PRM 3/31/09 | Est. #12 Nordic 6/12/09 | Est. #13 Nordic 6/17/09 | Est. #14 Nordic 7/5/08 |
|---|---|---|---|---|---|
| Appliances | | 3,511.68 | 2,544.74 | 2,544.74 | 3,239.20 |
| Cleaning | 13,363.06 | 6,773.85 | 14,616.93 | 14,616.93 | 13,193.20 |
| Contents Manipulation | | 2,918.65 | | | |
| Cabinetry | | 947.69 | 65,481.96 | 65,481.96 | 8,890.23 |
| Contents, Soft Goods Clean | | | | | 11,762.40 |
| Concrete / Asphalt | | | 7,950.00 | 7,950.00 | |
| General Demolition | 55,720.90 | 23,081.77 | 111,236.00 | 111,236.00 | 56,840.32 |
| Doors | 9,936.00 | 12,937.16 | 41,659.60 | 41,659.60 | 30,426.98 |
| Drywall | 74,084.44 | 84,458.32 | 69,731.65 | 77,848.55 | 107,555.79 |
| Electrical | 46,600.00 | 4,958.79 | 54,193.55 | 54,193.55 | 15,158.67 |
| Elec - Special Systems | | 2,767.05 | | | 5,848.21 |
| Floor Covering - Carpet | 31,904.78 | 29,822.01 | 29,166.57 | 25,729.55 | 20,552.39 |
| Floor Covering - Vinyl | 32,985.77 | 11,180.38 | 14,157.12 | 13,334.71 | 27,227.92 |
| Permits and Fees | | | | | |
| Finish Carpentry / Trim | | 281.78 | 4,091.42 | 4,091.42 | 2,881.49 |
| Finish Hardware | 7,143.66 | 8,344.72 | 9,828.88 | 9,828.88 | 5,791.97 |
| Fire Protection Systems | | | 69,278.44 | 69,278.44 | 69,278.44 |
| Framing / Rough Carp | 3,222.20 | 552.00 | 2,719.05 | 2,719.05 | 1,180.50 |
| HVAC | 28,585.76 | 2,984.46 | 17,840.05 | 4,994.60 | 2,420.00 |
| Insulation | 6,652.98 | 28,815.93 | 16,682.60 | 17,840.05 | 19,883.03 |
| Labor Only | | | | 16,682.60 | |
| Light Fixtures | 5,202.80 | 5,725.41 | | | 3,638.35 |
| Landscaping | | | | | |
| Misc Equipment - Comm | | | | | 488.54 |
| Mirrors and Shower Door | 1,858.92 | 971.48 | 1,864.58 | 1,864.56 | 1,287.24 |
| Plumbing | 10,968.37 | 31,759.89 | 55,004.22 | 55,004.22 | 13,979.10 |
| Paneling and Wood Wall Sys | | | | | |
| Painting | 85,469.45 | 64,637.28 | 68,246.42 | 68,246.42 | 67,315.83 |
| Roofing | 14,154.18 | 2,677.17 | | | 7,370.60 |
| Scaffolding | 8,772.80 | 1,354.56 | 72,220.00 | 6,915.00 | 4,695.00 |
| Soffit, Fascia & Gutter | 589.20 | 580.80 | | | 738.88 |
| Stucco / Exterior Plaster | 21,645.95 | 3,293.82 | | | 13,537.20 |
| Tile | | | | | |
| Specialty Items | | | 55,630.00 | 55,630.00 | 55,630.00 |
| Steel Joists | | | 4,695.00 | 56,800.00 | |
| Tempoary Repairs | 3,917.44 | 1,826.98 | 1,292.00 | 1,292.00 | 3,070.00 |
| Windows - Aluminum | 1,903.72 | 547.02 | | | |
| Window Treatment | 3,769.25 | 1,218.92 | 1,960.08 | 1,950.08 | |
| Windows - Vinyl | | | 11,042.57 | 11,042.57 | 12233.77 |
| Water Extraction ... | | | | | 883.8 |
| General Items | | | | | |
| Subtotal | 466,441.63 | 336,929.55 | 803,133.31 | 800,785.48 | 586,995.05 |
| Overhead @ 10% | 46,644.16 | 33,692.96 | 80,313.33 | 80,078.55 | 58,699.51 |
| Profit @ 10% | 46,644.16 | 33,692.96 | 80,313.33 | 80,078.55 | 58,699.51 |
| O & P Items Subtotal | 559,729.98 | 404,315.46 | 963,759.97 | 960,942.58 | 704,394.06 |
| Non-O&P Items | | | | | |
| BPP | 116,028.39 | | | | |
| Fire Protetion System | | 101,000.00 | | | |
| Electrical | 931.30 | 931.30 | | | |
| Non-O&P Subtotal | 116,959.69 | 101,931.30 | | | |
| WSST @ % varies | 60,225.38 | 45,055.96 | 91,557.20 | 91,289.54 | 61,282.28 |
| Total | 736,915.02 | 551,302.72 | 1,056,317.17 | 1,052,232.12 | 765,676.34 |
| Tax Rate Applied | 8.90% | 8.80% | 9.50% | 9.50% | 8.70% |
| Floor Area - sf | 9,019 | 9,019 | 9,825 | 9,825 | |
| Wall Area - sf | 35,767 | 32,983 | 37,608 | 37,609 | |
| Ceiling Area - sf | 9,406 | 9,406 | 9,672 | 9,672 | |

| Description | Est. #15 Nordic 7/20/09 Bldg | Est. #15 Code | Est. #15 Mold | Est. # 16 Nordic 7/21/09 | Est. # 17 Bruun 7/21/2009 | Est. # 18 Charter 10/6/09 | Est. # 19 Bruun 11/5/09 Bldg | Est. # 19 Code | Est. # 19 Mold |
|---|---|---|---|---|---|---|---|---|---|
| Appliances | 2,544.74 | | | 2,544.74 | 3247.49 | No Detail | | | |
| Cleaning | 10,902.15 | | | 10,902.15 | 11,288.27 | | | | |
| Contents Manipulation | 2123.88 | | 1061.94 | 2123.88 | 1,415.92 | | | | |
| Cabinetry | 45,891.96 | | 9,588.00 | 45,891.96 | 7,078.14 | | | | |
| Contents, Soft Goods Clean | | | | | 12,745.20 | | | | |
| Concrete / Asphalt | 7,950.00 | | | 7,950.00 | | *7,950.00* | | | |
| General Demolition | 99,206.80 | | 12,028.20 | 99,206.80 | 53,272.27 | | | | |
| Doors | 41,659.60 | | | 41,659.60 | 31,670.82 | | | | |
| Drywall | 50,285.47 | 18,150.33 | 15,238.44 | 50,285.47 | 108,263.17 | | | | |
| Electrical | 54,193.55 | 1,242.00 | | 54,193.55 | 18,374.61 | | | | |
| Elec - Special Systems | | 63.42 | | | 5,857.61 | | | | |
| Floor Covering - Carpet | 27,054.17 | | | 27,054.17 | 20,402.48 | | | | |
| Floor Covering - Vinyl | 11,025.48 | | | 11,025.48 | 27,114.75 | | | | |
| Permits and Fees | | | | | | | | | |
| Finish Carpentry / Trim | 5,098.66 | | | 5,098.66 | 3,290.59 | | | | |
| Finish Hardware | 9,478.98 | | | 9,478.98 | 6,413.53 | | | | |
| Fire Protection Systems | 69,278.44 | 88,430.00 | | 848.44 | 69,277.64 | | | | |
| Framing / Rough Carp | 1,198.65 | | 1,520.40 | 1,198.65 | 1,090.00 | | | | |
| HVAC | | 4,994.60 | | | 2,576.00 | *21,479.00* | | | |
| Insulation | 9,896.28 | 11,843.40 | 3,464.56 | 9,896.28 | 20,422.93 | *43,003.00* | | | |
| Labor Only | 16,682.60 | | 16682.6 | 16,682.60 | | | | | |
| Light Fixtures | | | | | 11,242.89 | | | | |
| Landscaping | | | | | | | | | |
| Misc Equipment - Comm | | | | | | | | | |
| Mirrors and Shower Door | 2,440.36 | | | 2,440.36 | 2,888.00 | | | | |
| Plumbing | 33,944.22 | | 21,060.00 | 33,944.22 | 28,093.84 | *9,000* | | | |
| Paneling and Wood Wall Sys | | | | | | | | | |
| Painting | 55,211.56 | | | 55,211.56 | 70,380.21 | | | | |
| Roofing | | | | | 5,284.14 | | | | |
| Scaffolding | 6,915.00 | | | 6,915.00 | 4,695.00 | | | | |
| Soffit, Fascia & Gutter | | | | | 738.88 | | | | |
| Stucco / Exterior Plaster | | | | | 38,293.70 | | | | |
| Tile | | | | | | | | | |
| Specialty Items | 55,630.00 | 55,630.00 | | | 55,630.00 | | | | |
| Steel Joists | 32,700.00 | | | 32,700.00 | | | | | |
| Tempoary Repairs | 2,003.20 | | | 2,003.20 | 2,310.00 | | | | |
| Windows - Aluminum | | | | | | | | | |
| Window Treatment | | | | | | | | | |
| Windows - Vinyl | 13,582.43 | | | 13,582.43 | 12240.32 | | | | |
| Water Extraction ... | | | 1786.88 | | 315.54 | | | | |
| General Items | | | | | | *11045* | | | |
| Subtotal | 668,898.18 | 160,353.75 | 82,432.00 | 542,838.18 | 633,851.94 | *633,851.94* | 477,667.55 | 194,849.00 | - |
| Overhead @ 10% | 66,889.82 | 16,035.38 | 8,243.20 | 54,283.82 | 63,385.19 | *72632.89* | 47,766.76 | 19,484.90 | - |
| Profit @ 10% | 66,889.82 | 16,035.38 | 8,243.20 | 54,283.82 | 63,385.19 | *72632.89* | 47,766.76 | 19,484.90 | - |
| O & P Items Subtotal | 800,277.82 | 192,424.50 | 98,918.40 | 651,405.82 | 760,622.33 | *871,594.72* | 573,201.06 | 233,818.80 | - |
| Non-O&P Items | | | | | | | | | |
| BPP | | | | | | | | | |
| Fire Protetion System | | | | | | | | | |
| Electrical | | | | | | | | | |
| Non-O&P Subtotal | | | | | | | | | |
| WSST @ % varies | 76,026.39 | 18,280.33 | 9,397.25 | 61,883.55 | 66,174.14 | *82,801.50* | 54,454.10 | 22,212.79 | - |
| Total | 876,304.21 | 210,704.83 | 108,315.65 | 713,289.37 | 826,796.47 | *954,396.22* | 627,655.16 | 256,031.59 | - |
| Tax Rate Applied | 9.50% | 9.50% | 9.50% | 9.50% | 8.70% | 0.95% | 9.50% | | |
| | | 1,195,324.68 | | | | | | $883,686.76 | |
| Floor Area - sf | | | | | 9,360 | 9,360 | 14,710 | | |
| Wall Area - sf | | | | | 32,412 | 32,412 | 33,711 | | |
| Ceiling Area - sf | | | | | 9,674 | 9,674 | 15,024 | | |

| | Ex. # 20 Brunt 11/5/09 | |
|---|---|---|
| | Cost | Misc |
| Reg | | |
| 614.85 | 728.34 | |
| 309.40 | | |
| 707.96 | | |
| 4,860.84 | 2,841.20 | |
| 800.60 | | |
| 52,666.78 | 11,042.17 | 106.28 |
| 33,907.28 | | 279.06 |
| 20,556.91 | 35,525.01 | |
| 39,762.99 | | |
| 7,500.88 | | |
| 50,033.99 | | |
| 32,674.57 | | |
| 2,421.70 | 777.90 | |
| 9,978.80 | 555.33 | |
| 54,073.72 | 68,435.00 | |
| 485.30 | | |
| 5,451.95 | 798.00 | |
| 75,313.77 | 2,588.62 | 115.92 |
| 9,096.88 | 1,177.50 | |
| 246.98 | 1,344.00 | |
| 20,606.54 | 2,602.10 | |
| 921.78 | 1,441.17 | |
| 72,534.05 | | |
| 2,777.30 | | |
| 4,693.00 | | |
| 283.38 | | |
| 170,766.00 | -58,650.00 | |
| 2,312.00 | | |
| 13,359.51 | 62.16 | |
| 453.13 | | |
| 479,694.85 | 162,631.70 | 650.79 |
| 47,998.49 | 9,263.17 | 60.09 |
| 47,998.49 | 19,263.17 | 60.09 |
| 575,661.82 | 231,158.64 | 729.94 |
| 54,206.67 | 21,995.01 | 68.49 |
| 632,583.69 | 253,116.05 | 798.42 |
| 9.50% | 9.50% | 9.50% |
| 1884,478.17 | | |

# EXHIBIT B

<u>EXHIIBIT B</u>

Christian T. Bratlien
**SCHEDULE OF TESTIMONY**
**(June, 2006 – Sept, 2010)**

| | **Case/File Name** | **Date of Testimony** | **Type of Testimony** | **On Behalf Of** |
|---|---|---|---|---|
| 1. | Taylor's Landing v. Allstate Insurance | June  2006 | Deposition | Defendant |
| 2. | Vision One Tacoma v. CNA Insurance Company | Sept, 2008 | Deposition / Trial | Defendant |
| 3. | Quest Diagnostics v. FM Global Insurance Company | December, 2008 | Deposition | Defendent |
| 4. | FM Global Insurance Company v. Brennan Mechanical | August, 2009 | Deposition / Trial | Plaintiff |
| 5. | FM Global Insurance Company v. Electrical Energy Services, Inc. | September 2010 | Deposition | Plaintiff |
| | | | | |

# EXHIBIT 2



600 Stewart Street, Suite 1800
Seattle, Washington  98101

Telephone  206.682.6500
Facsimile   206.625.9736

rgl.com

October 27, 2010


Timothy Allen, Esq.
Bennett Bigelow & Leedom, PS
1700 Seventh Ave., Suite 1900
Seattle, WA 98101-1397

Re:     MK Lim, Inc. dba Best Lynnwood Motor Inn v Greenwich Insurance
        Loss Type:      Business Income/Extra Expense
        Loss Date:      August 2008
        Case No.:       C10-cv-00374MJP
        Ref. No.:       1929.00021
        RGL File No.:   1021199

Dear Mr. Allen:

I was engaged by your office to evaluate the reasonableness, in light of applicable industry norms and standards, of the various requests, calculations, communications, acts and omissions on the part of Greenwich and its agents and independent contractors in calculating the claimed business income loss related to the August 10, 2008 fire loss at Best Lynnwood Motor Inn ("Insured"), as well as the time period required to calculate those losses.

The Insured owns and operates a 37-room motel in Lynnwood, Washington, consisting of one larger and one smaller building.  The larger building is two stories with 34 rentable rooms, and the smaller building has three rentable rooms plus the rental office.  This fire loss occurred in the larger building, impacting the Insured's ability to rent rooms.  The smaller building was not damaged.

My expert opinions are as follows.


## BUSINESS INCOME LOSS

It is my opinion that Greenwich Insurance and Mr. Chris Donoghue[1], the Certified Public Accountant retained by Greenwich as an independent contractor to evaluate the business income loss, acted reasonably and within applicable industry norms and standards in the review of the business income claim.

My opinion does not take into account the reasons why Mr. Donoghue apparently did not receive the insured's preliminary business interruption claim until December 12, 2008.  The insured's public adjuster, Mr. Dyer, states that he submitted the preliminary business

---

[1] Mr. Donoghue is a partner in the firm Quintana, Lopez, Donoghue & Gonzalez, LLP, located in Pasadena, California.


◢ United States  ◢ Europe  ◢ Asia Pacific

RGL Forensics
Discovering & Defining Financial Value

Timothy Allen, Esq.
October 27, 2010
Page 2

interruption claim to Greenwich via email on September 29, 2008.  From the records I have reviewed, I cannot determine why Mr. Donoghue did not receive the claim on September 29, 2008, if it was indeed provided to Greenwich on that date.  That said, it is my opinion that even if Mr. Donoghue had received the preliminary claim on September 29, 2008, it would be reasonable for Greenwich to request the underlying information upon which Mr. Smith relied in preparing his report, and to request actual operating performance data since the date of loss. Based on my review of the record, neither of these were provided with Mr. Smith's report either in September or in December.

My opinion does not take into account the lack of agreement between the Insured and Greenwich regarding the scope of work related to covered damage and the related period of time to complete the building repair.

## THE BASIS FOR MY OPINION

But for the gap period and the lack of agreement between the Insured and Greenwich on the scope of work related to covered damage and the related period of time to complete the building repair, the records I reviewed support that the activity on this file was consistent with applicable industry norms and standards.  A recap of the significant business income loss activity that illustrates this is listed below.

- Greenwich retained the services of Mr. Chris Donoghue on August 11, 2008, one day after the fire, to provide accounting assistance to Greenwich in the review of the business income loss.

- On December 12, 2008, Mr. Dyer sent Mr. Donoghue the preliminary business income loss report prepared by Mr. Don Smith, the CPA retained by the Insured.  The Smith business income report was for a 12-month period in the amount of $360,708, or $988 per day.

- Mr. Donoghue began an immediate correspondence with Mr. Dyer, and then with Mr. Smith, to obtain business records from the Insured.  The business records were necessary to understand and verify the data Mr. Smith relied upon in his computation of the business income loss.

- On December 23, 2008, Mr. Smith supplied the records he was able to obtain in response to the initial request for information.

- At the end of January 2009, Mr. Smith emailed three additional worksheets that were missed in his original document scan sent earlier to Mr. Donoghue.

- In early February 2009, Mr. Smith sent a pdf file to Mr. Donoghue stating this was everything that had been prepared to date by the Insured.

RGL Forensics
Discovering & Defining Financial Value

Timothy Allen, Esq.
October 27, 2010
Page 3

- On February 9, 2009, Greenwich issued a $75,000 partial payment on the business income loss.

- The request for post-loss information continued between Mr. Donoghue and Mr. Smith.

- Mr. Donoghue prepared several business income loss computations over a period of time that he sent to Kelly Cooper, the insurance adjuster.

- On April 24, 2009, Mr. Donoghue updated his business income loss computation to include additional actual business activity through February 28, 2009, in the amount of $113,745.60, representing a 6.67-month interruption period.  This works out to $563 per day.

- Greenwich issued a $38,745.60 check for the balance of the business income loss based upon Mr. Donoghue's April 24, 2009 updated report.

- On April 27, 2009, Mr. Scott Penner, attorney for Greenwich, issued a letter to Timothy Bearb, attorney for the Insured, and stated a final decision on the business income claim cannot be made until the period of restoration is determined.

- Requests for updated business information continued between Mr. Donoghue and Mr. Smith into the summer months.

- On September 25, 2009, the Insured's attorney demanded appraisal of the business income loss[2].

A more thorough (but not all inclusive) list of communications connected to the business income loss is shown in Exhibit A to this report.

The above sequence of events illustrates a consistent effort on the part of Mr. Donoghue to obtain information from the Insured to update his computation of the business income loss, providing a basis for Greenwich to disburse funds to the Insured for the business income loss. This activity is, in my opinion, consistent with applicable industry norms and standards. Moreover, Mr. Donoghue's per day business income loss amount was close to the per day business income loss amount ultimately awarded by the appraisal panel.  This contrasts sharply with Mr. Smith's suggested per day business income loss amount, which was 143 percent of the amount awarded by the appraisal panel.

I see no evidence in the material I reviewed that Greenwich or Mr. Donoghue at any time intentionally put Greenwich's interests ahead of those of its insured in the processing of the business income claim.

---

[2] The appraisal panel determined the period of restoration at nine months, exclusive of code upgrade work that is not covered by the Greenwich policy.  The business income loss awarded for this nine-month period was $189,000, an average of $690 per day.



Timothy Allen, Esq.
October 27, 2010
Page 4

I reserve the right to revise or amend this report pending receipt of additional information that may impact any of the opinions or statements made in this report.

## DOCUMENTS RELIED UPON

A list of the documents I have relied upon in this matter is attached to this report as Exhibit B.

## QUALIFICATIONS

I am a Certified Public Accountant, Certified in Financial Forensics and a Certified Fraud Examiner.  My Curriculum Vitae is attached to this report as Exhibit C.

## PRIOR TESTIMONY

A list of my testimony over the past four years is attached as Exhibit D.

## PUBLICATIONS

A list of publications I authored over the past ten years is attached as Exhibit E.

## COMPENSATION

I am being compensated $240 per hour for the study and testimony in this case.

I hope this report clearly explains the work I performed on the captioned matter and my conclusions.  If you have any questions or need more information from our work files, please contact me at your earliest convenience.  On behalf of RGL, thank you for the opportunity to serve you.

Sincerely,
RGL Forensics

Paul C. Sutphen, CPA/CFF, CFE
psutphen@us.rgl.com

Enclosures
PS/kc

**INDEX TO EXHIBITS**

MK Lin, Inc. dba Best Lynnwood Motor Inn v Greenwich Insurance

<u>Exhibit</u>                                        <u>Title</u>

A          List of Communications

B          Documents Relied Upon

C          Paul Sutphen CV

D          Paul Sutphen Testifying Experience

E          Paul Sutphen Publications

# EXHIBIT A

RGL Forensics
Discovering & Defining Financial Value

Exhibit A

## LIST OF COMMUNICATIONS

1

1.   August 11, 2008: Chris Donoghue CPA was retained by Alicia Melendez of Precision Risk Management one day after the fire occurred. (796, CF02600)

2.   August 12, 2008: Chris Donoghue issues letter confirming hire by Alicia Melendez. (805, CF02596)

3.   August 14 2008: Alicia Melendez referred Chris Donoghue to a prior loss at this same location with a prior owner. (840, CF02581).

4.   September 25, 2008: Don Smith issues a business income loss computation for a 12 month period showing two values, one $247,723 using prior owner reported sales, and the other $360,708 using prior owner reported and unreported sales, plus a growth factor. (1967, CF02247)

5.   September 29, 2008: Public Adjuster Bud Dyer issues email to Nathan Lomas with reference to the report of Don Smith. (3064, CF04191)

6.   October 23, 2008: ITS notes message left by Public Adjuster Bud Dyer to Ignacio Nunez that insured was getting loans to pay his employees. (2422, KC00484)

7.   November 10 and 11, 2008: Smith calls and leaves message for Ignacio Nunez (ITS Notes).  November 13: Smith calls Nunez and they connect.  Smith tells Nunez insured keeps calling him for status on loss of income.  Nunez advised Smith he would relay message to Kelly Cooper.  November 21: Smith calls and Nunez returns Smith call November 21 and leaves message that file is under review and Smith can call IA for status. (2825, 2827, KC00471, KC00469).

8.   December 1, 2008: Email from Kelly Cooper to Chris Donoghue asking to rush an initial assessment. (2982, CF02282).

9.   December 2, 2008: Kelly Cooper ITS notes of conversation with Chris Donoghue that he was told to "hold off" by Alicia.  Donoghue stated he has left messages for the insured regarding documents.  (2980, KC00465).

10.   December 8, 2008: Email between Nathan Lomas of Carwood Claims and Kelly Cooper regarding business income loss.  (3010, CF02292)

11.   December 8, 2008: Letter from Allwest Adjusters to Nathan Lomas with a proof of loss for the business income claim in the amount of $301,251.84 through June 30, 2009. (3397, SK00641).

12.   December 9, 2008: Emails between Harry Ha, insured's banker with Mirae Bank, and Kelly Cooper regarding loss payee info on checks and questions about the business income loss.  Cooper refers to the public adjuster refusing to proceed with repairs and demolition until there is an agreed cost of repairs.  Additional reference made to the CPA working for the insurance company not able to obtain needed documents for business income computation.  (3042-43, CF02244-45).



13. December 10, 2008: Emails between Kelly Cooper and Nathan Lomas, re business income. Lomas notes he is not working this part of the loss and that inquiries have come his way from public adjuster Dyer. Cooper replies that CPA has requested financial information. (3010, CF 02292)

14. December 13, 2008: Large Loss Report #3. (3056, CF 02217).

15. December 12, 2008: Bud Dyer issues email to Chris Donoghue following Donoghue's call to Dyer earlier the same day. Dyer sends Donoghue a copy of the Smith report, with instructions to contact Smith directly with any questions pertaining to the report. (3064, CF 04190).

16. December 15, 2008: Donoghue emails Dyer thanking him for the Smith report and includes a request for Smith and/or the insured to send specific documentation. (3063, CF 04166).

17. December 15, 2008: Smith issues email to Donoghue stating he will contact insured's accountant to obtain what is available. (3063, CF 04166).

18. December 15, 2008: Email exchange between Donoghue and Smith requesting expected available business records for the post loss period. Smith acknowledges. (3093, CF04166).

19. December 16 2008: Kelly Cooper email to Donoghue to reiterate to Smith that documents have been requested with no return calls. Referred to DOI complaint on this claim. (3110, CF 02261).

20. December 23, 2008: Email from Smith to Donoghue, Smith transmits the information requested to the extent it is available. (3414, CF04164)

21. January 8, 2009: Reference made in a Scott Penner letter of a business income analysis prepared by Donoghue through January 8, 2009. (WOCS 00642).

22. January 28, 2009: Email from Donoghue to Smith requesting updated information to document actual operating history for the now later period of loss in 2008, and all records received from prior owners used to support the Smith loss computation. Smith notes he has had only one prior email requesting information from Donoghue. (3414-16, CF 04164, 04165, 04170). Plus email attachment.

23. January 29, 2009: Email from Smith to Donoghue referring to Donoghue request for info made in December, with Smith stating he sent all that the insured had. (3434-3439, KC00383-00388).

24. January 29, 2009: Email from Smith to Donoghue supplementing earlier documentation with three additional sheets missed in prior scanning [Dec 23 email]. (3444 -3449, CF 04212 – 04217).

25. January 30, 2009: Email from Karen Clausi to Scott Klingsporn advising of DOI Consumer Complaint received by Greenwich on this claim, filed January 16, 2009. (3457, SK00610).

RGL Forensics
Discovering & Defining Financial Value

Exhibit A

26.    February 9, 2009: Smith sent a pdf file to Donoghue which included everything that had been prepared to date by the Insured.  Donoghue asks Smith to reevaluate the sales projection in light of the decline in the national economy and do some independent research into this issue.  Smith responded that he would send what he gets after receipt of Donoghue's report. (3580 – 3581, SK00488)

3

27.    February 10, 11, 18, 20, 26, 2009: Email exchanges between Smith and Donoghue regarding additional information requested by Donoghue and supplied by Smith. February 27, 2009: Email from Donoghue to Kelly Cooper stating for the most part we have what we need, and next needed is documentation of continuing operations in January 2009 forward.  Also refers to having obtained hotel industry information for the local area.  (3862 – 3866, KC00256).

28.    February 10, 2009: Donoghue's preliminary business income loss computation through November 2008. (3606, CF03108).

29.    April 21, 2009: Kelly Cooper requests *updated* report from Donoghue, which is sent the same day.    (4153, CF04070). [*Scott Penner March 1, 2010 letter identifies an analysis of the business income loss through March 31, 2009 by Donoghue*]

30.    April 24, 2009: Donoghue report dated April 24, 2009 for the period through February 2009. (4174, CF04049)

31.    April 27, 2009: Letter issued by Scott Penner, attorney for Greenwich, to Timothy Bearb, attorney for the Insured, states a final decision on the business income claim cannot be made until the period of restoration is determined. (4196, SK00308)

32.    April 27, 2009: Email from Kelly Cooper to Chris Donoghue asking for a 12 month income loss computation. (4200, KC00180)

33.    July 21, 2009: Emails between Donoghue and Smith, and Donoghue and Cooper. Regarding repeated requests to be provided with updated financials, and inquiry by Smith to obtain Donoghue report.   Cooper instructs Donoghue to not provide workproduct to Smith, attorney can do that when appropriate and with carrier approval. (5378, KC00136)

34.    July 21, 2009: Email from Donoghue to Cooper, referencing the analysis for a one year business income loss. (5762, KC00135)

35.    July 29, 2009: Email from Donoghue referring to updated business income loss report through April 2009. (7001, CF06063)

36.    August 3, 2009: Email from Kelly Cooper asking Chris Donoghue to prepare a business income loss computation through March 31, 2009, taking into account time to exclude for code upgrades. (7001, CF06063)

37.    September 25, 2009: Letter from Insured's attorney with appraisal demand. (7173, SK00165)

# THE DOCUMENTS REFERENCED IN TABS 1-37 TO "EXHIBIT A" HAVE BEEN PROVIDED TO COUNSEL SEPARATELY IN THE FORM OF A NOTEBOOK

# EXHIBIT B



Exhibit B

**DOCUMENTS RELIED UPON**

1

First Amended Complaint

Appraisal Award – Business Interruption

Expert Report of Michael R. Ruble, Ph.D. dated September 27, 2010

Expert Report of Gary Williams dated September 27, 2010

Documents contained in Exhibit A

# EXHIBIT C





**Paul C. Sutphen CPA/CFF, CFE**

**Partner**
Seattle

**T:** +1 206 682 6500
**F:** +1 206 625 9736
**M:** +1 206 679 0702
**E:** psutphen@us.rgl.com

Mr. Sutphen is an experienced partner in the firm's Seattle office. He supplements his credentials as a certified public accountant with a significant additional credential as a certified fraud examiner. He focuses his practice on commercial insurance claims, intellectual property, product liability and third-party lawsuits. He is an associate member of the American Bar Association. Mr. Sutphen often appears as an expert witness in a wide variety of legal venues on behalf of both Plaintiffs and Defendants.

**Educational Background**
Bachelor of Science - Accounting, Fairleigh Dickinson University, New Jersey, 1976

**Professional Status**
Certified Public Accountant, licensed in the State of Washington
Certified in Financial Forensics
Certified Fraud Examiner
Member, American Institute of Certified Public Accountants
Member, Washington Society of Certified Public Accountants
Associate Member, American Bar Association

**Professional History**
1997 - Present    RGL, Seattle, Washington
1979 - 1996       Campos & Stratis, Seattle, Washington
1978 - 1979       New Jersey State Police, Trenton, New Jersey
1976 - 1977       Chase Manhattan Bank, New York

**Court Experience**
Mr. Sutphen has testified as an expert witness in trials and/or depositions on behalf of defendants and plaintiffs in Washington, California, Oregon, Alaska, Louisiana, Idaho and Montana. He has been involved in numerous litigation matters which have settled prior to trial.

**Seminar Experience**
Mr. Sutphen has conducted seminars and presentations to clients and colleagues on various topics including the measurement of damages. He is a frequent contributor to national industry publications.

**Related Services**
Insurance
    Business interruption
    Catastrophe response
    Commercial property
    claims
    Fidelity/surety bond
    claims
    Liability claims
    Pre-loss reviews
    Special investigations
    Subrogation
Legal
    Commercial litigation
    Construction
    Family law
    Fraud investigations
    Insurance litigation
    Intellectual property
    Personal injury
    Product liability
    Subrogation
    Valuation & damages
    analysis
Corporate
    Fraud investigations

**Industry Experience**
Aerospace
Agriculture/Livestock
Banking/Financial services
Business & Support services
Chemicals
Energy
Fishing/fisheries
Food/Beverage
Hospitality, Leisure & Tourism
Manufacturing
Mining/Metals
Oil, Gas & Petrochemicals
Retail
Technology & Telecommunications
Utilities
Warehousing & Distribution

# EXHIBIT D

**RGL** Forensics
Discovering & Defining Financial Value

Exhibit D

## PAUL C. SUTPHEN, CPA/CFF, CFE
Partner
psutphen@us.rgl.com

### TESTIMONY EXPERIENCE

| Case | Site | Testimony |
|------|------|-----------|
| David Hick v King County | Seattle, Washington | Deposition |
|   Hired by:   Megan McCloskey<br>Rafel Manville PLLC | | |
| Jennifer Schubeck v King County | Seattle, Washington | Deposition |
|   Hired by:   Megan McCloskey<br>Rafel Manville PLLC | | |
| Tyler J. Crittenden v The Shark, Inc. | Seattle, Washington | Trial |
|   Hired by:   Thomas Collins<br>Merrick, Hofstedt & Lindsey<br>Seattle, Washington | | |
| Vision One LLC v Philadelphia Insurance Company | Seattle, Washington | Deposition<br>Trial |
|   Hired by:   Dino Vasquez<br>Karr Tuttle Campbell<br>Seattle, Washington | | |
| Defoor v Defoor | Seattle, Washington | Deposition<br>Trial |
|   Hired by:   Anthony Rafel<br>Rafel Law Group<br>Seattle, Washington | | |
| American West Steamboat v SDS Lumber | Portland, Oregon | Trial |
|   Hired by:   Philip R. Lempriere<br>Keesal, Young & Logan<br>Seattle, Washington | | |
| Kreidler v Pixler et al | Seattle, Washington | Deposition<br>Trial |
|   Hired by:   Donald Cohen<br>Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim LLP<br>Seattle, Washington | | |

RGL Forensics
Discovering & Defining Financial Value

**PAUL C. SUTPHEN, CPA/CFF, CFE**
Partner
psutphen@us.rgl.com

| Case | Site | Testimony |
|---|---|---|
| Young v Regence BlueShield | Seattle, Washington | Deposition |
| Hired by: Steve Stolle<br>Martens + Associates, P.S.<br>Seattle, Washington | | |
| Brunner v Nordic Insurance | Seattle, Washington | Deposition |
| Hired by: Anthony McHugh<br>Mullen Law Group | | |
| Leeann McDonald, et al v Atlas Foundry Limited Partnership, D/B/A Americast Technologies, Inc., et al v Engineered Controls International, Inc., et al | Tacoma, Washington | Deposition |
| Hired by: James Holbrook<br>Zelle Hoffman Voelbel & Mason LLP<br>Dallas, Texas | | |
| Karuza v BP Safway, et al | Seattle, Washington | Deposition |
| Hired by: Thomas Collins<br>Merrick, Hofstedt & Lindsey<br>Seattle, Washington | | |

# EXHIBIT E



# PUBLICATIONS BY
## PAUL C. SUTPHEN. CPA/CFF, CFE

August 2007, **"Internal Auditor"** Magazine
Fraud Findings: "Stealing Funds for a Nest Egg"

August 2008, **"Internal Auditor"** Magazine
Fraud Findings: "The One-Woman Show"

May 2009, "**Accounts Payable Journal On-Line**"
The $1.3 Million Heist (Almost)

# EXHIBIT 3

**Expert report of Danette K. Leonhardi in the matter of:  MK Lim, Inc., DBA Best Lynnwood Motor Inn vs. Greenwich Insurance Company, (Superior Court of the State of Washington, County of King No. 10-2-05341-7-SEA) in United States District Court, Western District of Washington at Seattle.**

This report is submitted in response to a specific request to provide an expert opinion on the claims handling practices of Greenwich Insurance Company with respect to the handling of a particular commercial property fire claim presently at issue in the matter, MK Lim, Inc., DBA Best Lynnwood Motor Inn vs. Greenwich Insurance Company.

Background and Experience:

Presently, I am the owner of Puget Sound Environmental Claim Consulting (aka Puget Sound Claim Consulting), a claims management service in the administration of complex claims. I also provide a full line of reinsurance services ranging from underlying claim auditing to treaty/facultative analysis, as well as claim handling consultation to direct writers. My claims experience spans 32 years in various capacities ranging from claims adjuster to reinsurance auditor to claims manager to consultant. I have handled or supervised wide variety of insurance lines and, literally, tens of thousands of claims involving:  General Liability, Worker's Compensation, Director's & Officer's, Inland Marine, Bond & Surety, Error's & Omissions, Personal Property, Commercial Property, Auto Liability and Accident & Health.

From 2000-2009, I was a claims manager for Unigard Insurance Company and its affiliates, now a subsidiary of QBE/Australia. From 1999 to 2000, I was a reinsurance consultant for Eastgate, Ltd. /London. And, between 1986 and 2000, I was a reinsurance claim manager for Unigard Security Insurance Company, Seattle/Boston, conducting audits of insurance company claim departments all over the United States, including the London and Brazilian markets. All of these positions required an intimate knowledge of claim procedures and handling practices, staffing requirements, workflow, training issues, production, coverage issues, litigation management and the ultimate disposition of claims.

Prior to 1986, I was a litigation supervisor for Home Insurance Company/New York (1985-1986); a property supervisor for the Chubb Group (1984-1985) and an outside claims examiner for Kemper Insurance Group (1978-1984). Additional background information is contained in my CV and attached to this report (Exhibit 1).

With regard to the claim at hand, I received extensive in-house and onsite training in homeowner and commercial property policies and losses while at the Kemper, Chubb and Home Insurance Companies. During my years as a reinsurance auditor, we reviewed many large commercial property fire losses presented under various treaty and facultative coverage. I am also familiar with the Revised Code of Washington (RCW) and the Washington Administrative Code (WAC) with respect to claim handling.

(The comments and expert opinions of this writer which offer up an opinion deviating from the scope of the loss at hand are noted in "bold" for the purposes of this report)

Basic Policy Information:

The procurement of insurance for the Best Lynnwood Motor Inn originates with its placing agent, C. Don Filer Agency, Inc. and flows through a third party broker, UCA General Insurance Services. UCA issues a Commercial Insurance Proposal through Greenwich Insurance Company

for the property the Best Lynnwood Motor Inn, purchased by the Lim's with a proposed closing date of 7/10/2008. (CF02563)  The policy contains common coverages for Commercial Property:  (CF02563)

| Property Coverages (and Perils) | Limit | Deductible | Co-Ins% |
|---|---|---|---|
| Building – Special Form – Replacement Cost | $1,650,000 | $1,000 | 90.00 |
| Business Personal Property – Special Form—Rep. Cost—Inc Stock | $ 106,000 | $1,000 | 90.00 |
| Business Income Coverage per ALS-2 | ALS[1] | | |

Per the agent's request, the mortgagee, Mirae Bank, SBA Dept, 3255 Wilshire Blvd, #701, Los Angeles, CA 90010, is listed as the first and second mortgage along with first and second payee. (CF02542, SK00025)  The Commercial Package Policy (CPP), # 636000229-01, 7/14/2008-7/14/2009, is issued on 7/16/2008 through Greenwich Insurance Company's Motel - Preferred program.

Loss:

On 8/10/2008, at 9:30am, a fire originates in room #111 on the first floor of the insured's two-story motel, the Best Lynnwood Motor Inn, from a candle owned by Rachel D. Martin. She admits to placing the candle on top of the mattress and igniting it. Ms. Martin admits to lighting the fire intentionally as she only has $1.35 and one more night to stay at the hotel. Since she'd received previous help from the Red Cross at another fire, she assumes she will again receive assistance if another disaster were to occur. (CF00006) Ms. Martin is taken into police custody on August 12th, 2008 on one count of arson.  The resulting damage:

> "The fire traveled out and up through the exterior window to the wall mounted air conditioner and window of the second floor room located directly above the fire room.  Fire also exited the room through the open door and traveled down the hall to the North and up the north stairs…..The door to room #116, two rooms north of the fire room, was also open, resulting in heat and smoke damage inside.  The north half of the first floor and the north stairs (open stairwell) sustained the greatest amount of fire damage with smoke damage through the building.  Damage was greatly reduced in rooms with closed doors….With the exception of room #116, which received excessive smoke damage and mild heat damage due to an open door, the remaining guest rooms remained free of flame damage and had varying levels of smoke damage." (Lynnwood Fire Department Investigative Report, CF00003-4)

The Lynnwood Fire Department estimates the structural damage at $250,000 and the contents damage at $150,000. (CF00003) All 34 rooms sustain some damage but #111 is a total loss and the room above it, #222, sustains extensive heat and smoke damage. (KC00545)

> "Both hallways are black, the carpet melted, the tops of the hallways (end-to-end) are charred and fire spread into both staircases.  All 34 rooms

---

[1] Actual Loss Sustained

sustained some damage.  2 rooms sustained extensive fire and smoke damage, 7 room sustained moderate damage and 25 rooms sustained light smoke damage." (KC00545)

Greenwich Insurance Company's Claim Handling in Initial Contact

The claim (#2008-4091-63) is immediately reported to Precision Risk Management, Cypress, California, on 8/11/2008, Monday morning, at 9:20am and assigned preliminarily to Alicia Melendrez, Property Specialist.  (CF02617)  Precision Risk Management (PRM) handles losses for Greenwich Insurance Company (GIC) as a third party administrator (TPA).

A local independent adjuster (IA), Michael Kennedy, Washington Oregon claim Service is assigned to handle the local claim adjusting responsibilities.  A Cause & Origin (C&O) investigator, Tom Miller, Unified Investigations, is also immediately asked to investigate. Additionally, Ms. Melendrez, immediately contacts Chris Donoghue of the CPA firm of Quintana, Lopez, Donoghue & Gonzalez, LLP, in anticipation of the Business Interruption claim (BI).  All of these assignments have been made by 3:24pm on 8/11/2008. (KC00549-51) Ms. Melendrez also makes the following germane inquiries:

- The nature of the insured's business—week-to-week versus month-to-month rentals? [2] (KC00551)
- Emergency and demolition services? (CF02604)
- Co-insurance evaluation – is the business adequately insured? (CF02604)
- Scope and estimate? (CF02604)
- Contents to be cleaned or repaired? (CF2604)

She further comments:  "This is a very important loss." (CF02604)  In her first "Property Large Loss Report #1, Ms. Melendez notes an original reserve of $950k:  $750k—building; $50k—contents; $150k contents. (CF02175)

Discussion of Preliminary Building Structure Loss:

On Thursday, August 14th, Mike Kennedy informs Ms. Melendrez the insured has hired a Public Adjuster, Bud Dyer, with All West Adjusters.  Mr. Dyer has also referred the insured to a forensic accountant in Tacoma, secured the building and procured a contractor, AllPro.

On Wednesday, August 13th, Ms. Melendrez sends a request to Scott Klingsporn, XL Group/Greenwich Insurance seeking a monetary advance to the Lim's of $50,000.  The advance is approved on 8/20/2008 and issued payable to: <u>MK LIM Inc dba Best Lynnwood Motor Inn and Mirae Bank, SBA Dept. and All West Adjusters, Inc.</u>  The "payment detail" notes the

---

[2] This was of substantive importance to the underwriting agency, UAC, as it increases the hazardous risk to the property and guests.  The insured, via their signed initial Motel Program Application, indicate **no** percentage of guests as "Weekly/Monthly or longer." Additionally, Mrs. Lim answers "no" to the questions: "Are vouchers & Parolees or HUD guests accepted?" (CF02550) Mrs. Lim also notes that none of the units have kitchenettes, which was inaccurate. (CF02357) Ms. Sherry-England Carlson, a Preferred Programs Underwriter for UCA, intends to send out a <u>Notice of Cancellation</u> based on this fact and the previous answers of the insured to their questionnaire. (KC00540)

payment for "Fire Damage – Building Advance $50,000." (CF02508)  The check is printed on 8/21/2008 and is sent on 8/26/2008 via overnight DHL delivery to Mike Kennedy for delivery to Mr. Dyer.

Also included with the check is a letter which outlines the insured's "Duties in The Event of Loss Or Damage," "Loss Payment," "Optional Coverages," "Replacement Cost," "Business Income," and "Definitions." (CF02491-96)  The letter is delivered via fax on 8/28/2008 and the check is handed to Mr. Dyer on 8/28/2008.

Further to this discussion, Mr. Kennedy opines that he does not see much reason to write an estimate as it would be more effective to pay an insurance contractor to go in and write an estimate which would essentially be a more qualified counter to the Mr. Dyer's demand of gutting the entire interior. (CF02576).

On/about August 27th, PRM engages the services of McBride Construction to inspect the damages and provide a repair bid, in concurrence with earlier comments made by Mr. Kennedy. However, this does not negate the request for Mr. Kennedy's repair estimate and the building's coinsurance evaluation. (KC00516)  Ms. Melendrez still has important concerns such as code upgrades and removal/storage of the motel's contents. (KC00518)  As of September 3rd, the PRM handling of this loss is transferred from Ms. Melendrez to Ms. Kelly Cooper due to Ms. Melendrez's maternity leave. (KC00518)

At this point, a little more than two weeks after the loss, GIC still has not been allowed (by Mr. Dyer) onto the site to write an estimate.  Mr. Dyer and his contractor, AllPro Construction, wish to develop their own scope and review it onsite with the IA first and GIC's contractor thereafter. (KC00513)  The carrier is denied access to the site without the permission from the PA. The concern regarding the PA's noncompliance, in allowing GIC onto the premises, precipitates a phone call from UAC to the insured to allow an inspection of the building. (KC00505)

**Based on the file record, it is my claim handling opinion Greenwich Insurance Company (GIC) immediately responded to the loss within proper initial claim handling standards, realizing both its importance and seriousness.**

GIC engages the services of a new IA, Nathan Lomas, Carwood Claims, along with a new contractor, Alliance Restoration, in early September. (KC00499)  This has nothing to do with "estimate shopping" but with the issues between Mike Kennedy and Mr. Dyer and the necessity of moving this claim forward. [3] (KC00501)  GIC notes Mr. Kennedy is not able to attend to this claim "as directed" and McBride needs a different timeline for completion of their estimate. [4] (CF 04246 & CF04242)

---

[3] **It is this writer's experience through extensive auditing of multiple carriers and their subsidiaries that insurance companies strive to meet and/or exceed accepted claim handling standards.  In addition to the matter of good faith responsibility, conflict is very expensive, directly impacting loss ratios and available business capacity.  Consequently, insurers, including GIC, strive to make good, pragmatic decisions to ease the burden of conflict and control costs.**

[4] It is also duly noted that Mr. Dyer, not Greenwich, expressed concern over the use of Alliance Restoration, alleging Alliance "harbors a strong bias against Public Adjusting firms." (CF04328)

**None of these changes are uncommon and are normal in course of handling any particular claim. To speculate this behavior is, in some manner, to financially benefit the insurer is an erroneous assumption and without evidence. Many things factor into the change of adjusters and contractors such as caseloads and skill levels. As a claim unfolds, so often does the need for a different claim handling approach and skill level. Indeed, to change adjusters isn't cost efficient for an insurer as the new adjuster bills time for catching up on the history of the file and contractors often charge for their estimates.**

The estimates proceed to come in over the next 60 days and are all in various stages of completion, underscoring the variables and general difficulties at arriving at an agreed-upon estimate. As more information comes in from subcontractors, the estimates continue to evolve:

| Appraiser | Estimate | Approximate Date of Submission | Cite |
|---|---|---|---|
| Carwood | $345,784.31 | October 2nd, 2008 | KC00487 |
| AllPro | $481,636.64 | September 2008 | CF03092 |
| Alliance Restoration | $748,339.01 | October 15th, 2008 | CF03645 |
| Carwood | $608,492.52 | October 15th, 2008 | CF04035 |
| AllPro | $883,174.36 | October 28th, 2008 | CF02760 |
| Alliance Restoration | $743,107.10 | October 31st, 2008 | CF03515 |
| Alliance Restoration | $728,878.25 | November 13th, 2008 | CF03385 |
| Carwood | $619,562.79 | December 12th, 2008 | CF03942 |

An example of the issues that inundate each of the estimates is noted in Carwood Claims' December report:

> "After discussion with Ryan Miletich, our contractor from Allied Restoration, it is apparent all the drywall will need to be replaced in all units. Smoke has damaged insulation on the other side, and the stud walls will need to be sealed to contain the smoke odor. The doors and base molding are porous materials, and will need to be replaced, along with the floor coverings. Six units and both hallways will need to be re-wired. AllPro, the contractor working with the Public Adjuster, is claiming the entire building will need to be rewired, because the type of wiring that is in place cannot be cleaned and sealed, per the county. We are awaiting documentation from them supporting this claim. We are also awaiting supporting documentation for the building code requirement that a sprinkler system be added to the inn.

The other major concerns we attempted to address with AllPro were the stucco repairs, and window repairs. AllPro claims that there is a matching issue with the windows, as they cannot get aluminum windows anymore, so all the windows will need to be replaced. Because all the windows are going to be replaced, they feel that all of the stucco siding will need to be replaced on the front, right and rear sides of the building where the stucco exists. It seems excessive to us to replace all of the siding." (CF04159)

In reviewing the estimates, the differences are narrowed down to four categories: drywall, electrical, stucco and windows.

In his letter of 10/31/2008, Mr. Dyer opines that one meeting between AllPro and Alliance Restoration is sufficient for an agreement on the extent of damage and scope of this loss and "suggesting we must meet once again 'so we may reach agreement on scope and costs' at this point in time seems unreasonable." (CF02342)

**With regard to this loss and its accompanying complexities, clearly one meeting is insufficient. At all points, the insured, by virtue of policy language, is called upon for complete cooperation:**

    Policy 63600229-01, Building and Personal Property Coverage Form, CP 00 10 04 02, Commercial Property:
        E. Loss Conditions:
            3. Duties In the Event of Loss or Damage
                a. You must see that the following are done in the event of loss or damage to Covered Property:
                    (1) Notify the policy if a law may have been broken
                    (2) Give us prompt notice of the loss or damage. Include a description of the property involved.
                    (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.
                    (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.
                    (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.
                    (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property

for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

**As shown and expected, the repair estimate for the Best Lynnwood Motel is a completely mutable number, as variable as the contractors and estimators writing them. In a loss like this, arriving at an agreed-upon number is a laborious task for all concerned and it is incumbent upon both the insured and the carrier to expend as much effort as necessary to seek resolution. Neither party can exempt itself from this process or make limitations on the number of meetings. They both have a mutual goal to achieve and neither party has the option of stopping the process.**

**In the same letter, Mr. Dyer suggests GIC's vendor, Alliance Restoration, isn't releasing its estimate because it is higher. (CF02341) This assertion lacks any merit as evidenced in the actual estimates themselves and defies logic. If such were indeed the case, GIC is better served accepting the AllPro estimate. Ms. Cooper has yet to receive either the completed Carwood Claims or Alliance Restoration estimates until November 10th. (KC00472)**

On 11/25/2008, Mirae Bank, through its property claims department, Delos Insurance Company, begins its inquiry as to the payment to the insured (and the bank) of the two checks, totaling $100,000. (KC00468) The checks have been cashed without the endorsement of Mirae Bank with only the Lim's and Allwest Adjuster's signatures. (CF02243) This is a serious violation of both the terms of the legality of the check and the insurance policy itself, both of which a Public Adjuster should be aware. Images of these endorsed checks are provided to the Mirae Bank. (CF02238)

The bank expresses concern the insured is not making the repairs to the property—nothing has been done. (KC00459). The demolition hasn't even been started. (KC00459) The Public Adjuster is refusing to proceed with repairs and demolition until there is an agreed cost of repairs. (KC00455). The Bank invokes their right to receive payments directly. It is their intention to ensure the repairs are completed and they intend to pay the contractors directly. (KC00456)

**At this point, clearly the insureds are not mitigating their damages, in clear violation of policy verbiage. The insured's duty to mitigate its damages after a loss is a very well recognized principle in property insurance law and in Business Interruption income claims. They are required to take affirmative steps to protect their property and reduce their loss of earnings after a loss. Mr. Dyer's refusal to proceed with repairs and demolition undermine the fundamental part of insurance that a policyholder has a duty to take reasonable steps to mitigate damage. In some instances, damage which may result from the failure to mitigate may not be covered.**

On 12/16/2008, Ms. Cooper requests an "Undisputed Payment Amount" of $174,000 to be forwarded to the insured. (C/o Mirae Bank)[5] This payment is sent to Scott Penner on 12/17/2008 and subsequently forwarded to Mirae Bank on 12/29/2008. (CF04410)

Discussion of Preliminary Business Interruption Loss:

**Business Interruption insurance is intended to compensate the insured for the income lost during the period of restoration or the time necessary to repair or restore the physical damage to the covered property. It is always the insured's burden to provide complete and competent proof of an actual monetary loss as a result of the suspension of its operations.**

On September 25th, Smith & Co., forensic accountants and claim consultants, present a loss of income in the amount of $360,708 to the Lim's. There is no evidence this letter is sent to Kelly Cooper and GIC. C. Donald Smith bases his opinion on the Lim's daily average gross receipts of $1,775. for 27 days and an annualized total of $647,861. Ultimately, Mr. Smith uses a more conservative annualized number, $592,821, for projected receipts. He also notes the prior owner from 2007 did not report 28.6% ($158,144) of his income. (CF02247) Presumably, this was not reported to the IRS.

Discussion of Preliminary Business Personal Property Loss:

Mr. Dyer completes a contents inventory for the Best Lynnwood Motel on September 30th. However, the file indicates this inventory is not received by GIC (Kelly Cooper) until November 13th, 2008. Mr. Dyer's total replacement cost estimate is $132,824.38, (-) total depreciation of $28,711.31, for a total actual cash value of $104,113.07. (CF03860) The Lim's business property claim includes such non-business items as a bag of peanuts, 3 oranges and one swimsuit. (CF03855) The contents report of the PA conflicts, initially, with the report of GIC's IA, Mr. Lomas, as to the necessity of replacing various items. Mr. Lomas maintains all of the soft goods (bedspreads, sheets, etc.) will need replacing but the hard goods (icemaker, chairs, tables) can be cleaned and are salvageable. (SK0082)

On 10/6/2008, Ms. Cooper requests a second advance of $50,000. A second check for $50,000 is sent overnight to Nathan Lomas on 10/27/2008, for delivery to the insured's PA, with the same verbiage, payees, and letter included in the first $50,000 advance.

Retention of Legal Counsel by Greenwich Insurance Company:

On 10/27/2008, GIC retains the services of Scott Penner, Carney, Badley & Spellman as coverage counsel.

**There has been assertion this was done to blatantly "hide" the course of "shoddy" claim handling through attorney-client privilege. Again, this position is wholly without merit, evidence and blind to the basic facts of this very complex loss. Many carriers procure the assistance of coverage counsel on large losses out of an abundance of caution and respect for the complexities of the law of any given state. At this point, in this 78 day-old claim, a**

---

[5] Ms. Cooper's calculations are based upon: $346,784.31 Undisputed Building Damages (-) $70,828.53 Recoverable Depreciation (-) $1,000 Policy Deductible (-) $100,000 Advance Payments.

number of substantive issues, for which a carrier <u>should</u> have coverage counsel, have presented themselves and include, but are not limited to:

- The cause & origin of the loss is arson; the insureds have owned the property for one month and the policy is one month old.
- The insured has presented contradictory information regarding the risk of their motel (see Footnote #2) which could result in cancellation.
- The relationships are verging on non-constructive, essentially stalling the forward progress of the claim. (Footnote #4, #11)
- The PA and the insured are endorsing and cashing checks without knowledge of the lien-holder, Mirae Bank, also named on the check.[6]
- The estimates for repair have extensive variation.
- PRM is not a local TPA and needs local counsel offering guidance.

Ultimately, the insurance policy itself advises the insured a carrier may engage the services of a counsel and that not all information is available to the insured:

Policy 636000229-01, "Notice to Policy Holders, Form PN CW 02 0505, Page 3 of 3:

- Claims –…The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts to aid the claim specialist in determining how best to handle your claim.   In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you… (CF03156)

Retention of Legal Counsel by the Insured:

By letter of 12/11/2008, the Lim's retain Michael T. Watkins, Law Offices of Michael T. Watkins, who proceeds to assert a 20-day notice for violations of the Insurance Fair Conduct Act, Pursuant to RCW 48.30.015. Their "reason for claim:" are as follows:

1. Specific Unfair Claims Settlement Practices Defined (WAC 284-30-330)
2. Standards for Prompt, Fair and Equitable Settlements Applicable to All Insurers (WAC 284-30-380)
3. For unreasonably denying a claim for coverage or payment of benefits under the Insurance Fair Conduct Act (RCW48.30)

Under WAC 284-30-330, there are 19 published practices and the party filing the notice is asked to identify which of the 19 practices "specifically applicable to the settlement of claims" applies. In the course of Mr. Watkins' correspondence, there is no identification of the germane practice

---

[6] One can only speculate how the outcome of this claim may have been different with the immediate involvement of the bank as the co-owner of the motel if they had been placed, initially, on notice of this loss by either the insured or the receipt of the two $50,000 checks for endorsement. The Mirae Bank SBA department (Small Business Association) may have been equipped to help or monitor the progression of repairs, along with the payment of its mortgage.

that has been violated or inclusion of any productive information that might underscore a specific allegation. The basis for the complaint, among the 19 published practices, is unclear.

He also claims the "Standards for Prompt, Fair and Equitable Settlements Applicable to All Insurers" (WAC 284-30-380) has been disregarded. Again, no specific complaint or evidence is provided. And, finally, RCW48.30.010 is also "checked." RCW48.30.010 generally defines unfair practices and offers up specific remedies through the Department of the Insurance Commissioner:

> **RCW 48.30.010**
> **Unfair practices in general — Remedies and penalties:**
> **(1) No person engaged in the business of insurance shall engage in unfair methods of competition or in unfair or deceptive acts or practices in the conduct of such business as such methods, acts, or practices are defined pursuant to subsection (2) of this section**

However, by the date of his letter, Mr. Watkins's clients have already received $100,000 in advanced funds and an additional $174,000 will be leaving PRM on 12/17/2010.

The Continuing Business Interruption Income Loss:

While GIC continues to evaluate the structural damage, the Business Interruption claim continues concurrently in the background with GIC's CPA, Chris Donoghue, requesting supplemental information from the insured's CPA, Mr. C. Donald Smith in early December. (CF02292) The insured has submitted a "Sworn Statement in Proof of Loss for (Partial) Business Loss from DOL through June 30th, 2009," dated 12/9/2009. (SK00648)   It is incumbent upon the insured to verify and document their loss. To this end, the insured's CPA is asked to provide:

- Monthly revenues, by day & room number for all available months in 2008
- Monthly financial statements for 2008
- Monthly payroll records for 2008.[7]

Mr. Donoghue again requests information from the insured's CPA on 1/28/2009 as nothing has been received and 2008 has drawn to a close. (CF04164) The information he seeks is extremely important as it is the foundation for the insured's business interruption loss, documenting the expenses (and income from the undamaged building) for the period since 8/10/2008:

- 2008 monthly financial statement (Oct 2008 has already been provided, please provide the other months since Insured's current ownership)
- Daily sales status sheets for July – December 2008 (less those already provided, which appears to be for 7/14 to 7/27/2008)
- 2008 room tax returns and/or sales tax returns
- All records received from the prior owners, used as supporting documents in your claim calculation. (SK00498)

---

[7] The insured has operated the hotel for less than a month prior to this loss so financial information from the prior owner will be vital.

On February 9, 2009, the insured's CPA provides all financials that has been prepared to date.[8] This allows Mr. Donoghue to prepare a Business Interruption Income loss for the first three months of $74,548.29, resulting in GIC's advance payment (2/9/2009) of $75,000.[9] Ms. Cooper also prepares a supplemental advance for the undisputed contents loss in the amount of $25,000.

And, as of 3/9/2009, Ms. Cooper is recommending yet another Business Interruption Income advance payment of $38,745.60. (CF06176) This is paid on 4/29/2009. (CF04042) As both parties realize, the final business interruption calculation is based upon the period of restoration and, to this point, neither party agrees upon the scope of repairs so, therefore, the period of restoration.

**Once this period is established, the business income calculation can be completed. It is extremely important to acknowledge the Business Interruption claim is reliant on the scope and timeframes developed in the estimates as these will become relevant in calculating the period of business suspension.**

**Any assertion that GIC did not adequately respond to the urgency of the insured's financial situation is completely unfounded. The complexity of determining this portion of the insured's claim is highlighted by the complete lack of data and the brevity of the insured's ownership. And, what was available was very questionable. Mr. Penner sums the situation in his letter of 4/27/2009:**

> **"However, although the report of your client's CPA acknowledges that 2007 gross sales "per income tax return of prior owner were "$393,606, it bases your client's claim on a figure of $551,750, which includes $158,144 of "unreported income," income claimed to have not been reported to the Internal Revenue Service. Further, the business income claim calculates income receipts for the claimed loss period in 2008-2009 to increase 7.44% which ignores the national and local economic collapse that occurred in the fourth quarter of 2008." (SK00308)**

Appraisal:

By letter of 1/9/2009, Mr. Dyer exercises the insured's right under the policy to submit the structure and contents portion of their claim to an appraisal. He states in his correspondence that:

---

[8] Mr. Donoghue notes the fourth quarter of 2008 has been devastating to most business communities, all confirming a sharp decline. It is his opinion the Lim's would have experienced the same result thereby making a year-to-year comparison unrealistic.

[9] The Lim's "Sworn Statement in Proof Loss (Partial business Loss from DOL through June 30th, 2009)" presupposes GIC to prepay $301,251.84 for the entire 2008-2009 year. (SK00648) Generally speaking, the manner in which the business interruption claim is handled, and the business's recovery effort made, will have a profound impact on the company's ability to thrive after the loss. Immediately after a loss, expenses generally skyrocket as revenues plummet so it is tremendously difficult to gage what the Business Interruption will be. GIC responded to requests for advance payments because it was in everyone's best interest for the insured to invest monies to limit the claim to the fullest extent possible.

"It is clear that the insured's and Greenwich Insurance Company have reached an impasse with regard (to) the issue of structural repair and contents damage evaluation pertaining to the above noted claim." [10] (SK00689)

**The appraisal process involves two appraisers for the insured and the carrier, respectively, along with a mutually agreed-upon umpire. However, instead of expediting the process of settlement on both of these issues, this will virtually guarantee a slower resolution as the entire process of appraisal will begin over. While not particularly desirable in terms of expediency, given the previous difficult nature of this claim and the disagreements, appraisal is clearly the most effective and efficient path to resolution.**

Carwood Claims did not wish to represent GIC in the appraisal process, necessitating the need for another appraiser. Unequivocally, this has nothing to do with GIC's opinion of the Carwood Claims' estimate, contrary to the feelings of the AllPro estimator, Greg Ruther:

"Ok, now we need another contractor due to the first two the Insurance Company sent out they did not like their opinion. Well isn't that special! I can get something in writing for the electrical. The problem with the window is you can't match them aluminum windows are not made any more. (S)o this is a matching issue. Stucco – if all the windows have to come out and all the AC units we need to stucco the whole building. Gutters we need down spouts. I will send you estimate for fire system. The last thing is drywall I figured to replace all the drywall. This was the opinion of the other two contractors that was out there but what they say doesn't count.    Greg[11]

And, in addition to choosing their respective appraiser, John Colvard, GIC chooses Nordic Construction to complete the appraisal process. The Lim's also utilize a new contractor, Charter Construction, represented by Wes Snowden, accompanying their appraiser, Roger Howson.

Building Structural Appraisal & Award:

GIC's work on the Lim's building structural loss continues on, despite the call for appraisal. Additional items are clarified again increasing costs over the original ACV estimate resulting in another undisputed estimate in the amount of $511,904.17. (CF06152) On March 9, 2009, Ms. Cooper calls for another advance in the amount of $82,863.28.[12] (KC00250).

**By this time, the Lim's have received or are in the process of receiving a total of $456,863.28 which completely negates any assertion the insured's were being denied coverage and the benefits of their policy.**

---

[10] The GIC file material does not indicate an impasse or unwillingness on the part of GIC to continue toward the resolution of these issues.

[11] AllPro has yet to provide the documentation for their estimate and clearly has an opinion on the process to date.

[12] Ms. Cooper's calculations are based upon: RCV $511,904.17 (-) Depreciation $152,085.14=ACV $359,819.03 (-) Deductible $2,000.00 = NET $357,819.03 (-) PD $274,955.75 = $82,863.28. (CF04043)

However, numerous issues still remain on these estimates including code upgrade issues, contents listed as part of the building, replace vs. repair for fixtures, equipment replacement on items which should be repairable or undamaged, replacement of only damaged windows, replace vs. repair of stucco, replace vs. repair of the roof and the fact that material measurements did not subtract for window and door openings. (SK00366)

In the course of constructing an estimate, none of the contractors agree upon a scope of work, contrary to the allegations of the Lim's attorney. (SK00339) The GIC appraiser suggests an engineer be hired to assess any engineering issues, not the least of which involves the requirements to repair the roof. In addition, the engineer, Mr. Mark Uchimura, requests asbestos, electrical circuit and mold testing—all necessary to developing the scope of repair. It is also noted GIC underwrites the cost of the engineer, not the insured.

The engineer's scope is completed on 4/29/2009 and over the next several months, a number of independent contractors engage in bidding on various issues, including scaffolding, stucco and electrical. Nordic enters its first estimate on June 12th, 2009 for $1,055,317.20. (CF04849) Code changes and upgrades amount to $199,931.80 (RCV). (CF04672)

However, Nordic's estimate contains a number of errors and scope deviations. Since their estimator, Dan Porter, will be leaving the country for one month, Nordic utilizes another of its estimators, David Omli, to complete the estimate. Mr. Omli' estimate is completed on 7/21/2009: $713,289.37 for structural damage; $108,315.63 for mold remediation and $210,704.83 for code upgrades or $942,309.83. Due to concerns about scheduling, time constraints and errors in the Nordic estimates, GIC retains another contractor, Bob Gross, Lorentz Bruun, who also completes a bid for $445,805.89 building; $309,479.56 code upgrades and $73,021.17 for mold repair for a total of $826,306.32.

GIC accepts and submits the appraisal of Lorentz Bruun to the appraisal panel on 7/24/2009 based upon the approved scope of repairs. It also stated it will issue payment for the full replacement cost rather than the ACV, further trusting the insured will affect the repairs. (CF06048) As part of the appraisal process, the insured's counsel, Timothy Bearb, issues his submittal (July 31st, 2009) noting such issues as: 1) the engineer is not a contractor; 2) Lorentz Bruun's incorrect costs and flawed scope of work; 3) no subcontractor bids and 4) the out-of-state status of Lorentz Bruun.

Of particular interest is the insured's thinly-veiled concern that the "extreme" delay of this claim has caused mold damage and, therefore, ultimately, is the responsibility of GIC. (CF06035 – Footnote #1)

Again, as part of the appraisal process, GIC provides its rebuttal to Mr. Bearb's comments, most notably that the insured never objected to any component of the scope prepared by the engineer. GIC notes, importantly, the Lorentz Bruun estimate incorporates data from Nordic and the other contractors. Additionally, the Lorentz Bruun estimate corrects a host of errors made in the Nordic estimate. GIC also reminds the appraisal panel that:

> "The insured makes no mention of the fact that hundreds of thousands of dollars have already been advanced to the insured and virtually no effort was undertaken to conduct basic remediation or repair activity." (SK00186)

Both the Lim contractor and the GIC contractor agree to collaborate and use the Lorentz Bruun estimate "as a basic template" to create a final, joint estimate for submission to the appraisal

panel. (SK00156)  The Lim's present their estimate in the amount of $954,396.22, including $6,000 in mold remediation and $83,133.17 in code upgrades.  The appraisal panel mandates the estimates for submission be actual bids.  A time delay is noted in the Lorentz Bruun estimate. Lorentz Bruun feels they are being "hamstrung" by the ambiguity of the City of Lynnwood's code requirements. (KC00053)  The Lorentz Bruun estimate is finally submitted on November 5, 2009 in amount of $627,119.94 for building repairs, $256,031.59 for code upgrades and $789.43 for mold remediation or a grand total of $883,940.94.  (CF01803 & CF01801)

On November 12, 2009, the appraisal panel enters the first award of a two-award part series. The total building claim award is for $912,682.81 as follows:

|  | Replacement Cost | Actual Cash Value |
|---|---|---|
| Structure Repairs | $655,861.81 | $473,323.13 |
| Structure (CODE) | $255,910.48 | NA |
| Structure (mold) | $      910.52 | $      910.52 |
| Total Building Claim | $912,682.81 | $474,233.65 |

It is extremely important to remember this is an award, in total.  The actual payment to the insured takes into account the policy deductible and amounts previously paid, along with policy limits on code upgrades and limitations on contents due the ITV (Insurance-to-Value) component of the commercial property policy.

Business Personal Property (Contents) Appraisal & Award:

Originally, Carwood Claims, by virtue of its 12/21/2008 building repair estimate, also provides a content evaluation in the amount of $116,028.39. (CF03866) The predominant issue revolves around cleaning versus replacing.  There is indication of replacement of furniture in rooms which have little to no smoke damage as well as cable connections, waste baskets, plastic ice buckets, shower curtains, light bulbs and table lamps. (KC00423)  GIC's appraisal submission is substantiated by photographs taken by Nathan Lomas, along with the original Carwood Claims contents inventory.

On February 5th, 2010, the appraisal panel awards the Business Personal Property value, taking the unusual step in providing two sets of numbers, based on two separate dates of loss (SK00109):

| Date of Loss | Replacement Cost | Actual Cash Value |
|---|---|---|
| 8/10/2008 | $75,781.22 | $49,462.90 |
| 2/15/2010 | $134,769.00 | $83,322.93 |

The panel concludes the likelihood of successful salvage and cleaning of the contents after moisture, smoke and mold exposure is low after 18 months of **"no mitigation steps."** (CF01460) By virtue of both of these awards, Ms. Cooper proceeds to request an additional "prefunding" request for the following payments in addition to another Business Interruption income advance (CF01250):

Amount: $115,414.62 (ACV) Building
Amount: $182,538.69 (RCV) Building

Amount: $ 13,286.94 (ACV) BPP
Amount: $ 14,459.86 (RCP) BPP
Amount: $ 15,100.13 BI – Business Decision

            Total:        $340,800.24

Business Interruption Appraisal & Award:

On April 27th, 2010, the appraisal panel hands down the award for Business Interruption income. The panel expressly decides the court should decide the issue of particular loan extension costs in the amount of $43,750.

The period of restoration is decided to be 9 months (exclusive of code upgrades) or 12 months (inclusive of code upgrades). However, the appraisal does not address when the period of restoration begins. The first award (9 months, exclusive of code upgrades) is $189,000 and the second award (12 month, inclusive of code upgrades) is $262,000. When this appraisal award is granted, GIC had already advanced a total of $128,845.73 in Business Interruption income. (CF01467) GIC has paid $75,000 on 2/6/2009 and $38,745.60 on 4/24/2009 and, finally, $15,100.13, after the original Building Structure and Business Property awards are made.

By the time the final Business Interruption appraisal award has been made, the Lim's have already been paid 68% (9 months) or 49% (12 months), respectively, of their business income claim.

                                        ***

A tremendous amount of documented evidence has been presented this report in order to show Greenwich Insurance Company's responsiveness and diligence in handling the Lim's claim. It also demonstrates the difficulties they confronted in handling a loss that was anything but an "uncomplicated, everyday fire." Both parties struggled with the time element, the variable nature of structural repairs and a deteriorating economic picture. However, the evidence clearly demonstrates Greenwich Insurance Company was not in the business of "estimate shopping," delaying payments or engaging in any behavior for its own financial gain or benefit.

Any accusation of such, as a basis for a bad faith allegation, is completely without evidence, substance, merit, or an appreciation for the inherent complexities of a fire loss of this magnitude. A little over 8 months into the loss (April 24th, 2009), the Lim's have been paid a very substantial portion of their loss or a total $496,564.63 in advance payments to keep their business going and to start repairs. (CF01467) None of which was done.

It is the duty of every insured to engage in the settlement of their loss and mitigate their damages. Any behavior to the contrary is tantamount to non-cooperation under the terms of the policy. The evidence shows the Lim's presented their Proofs of Loss and did little-to-nothing to mitigate their exposure by shuttering their motel in a clear violation of their duties under their policy.

Conclusion:

Based upon my 30+ years of experience handling extraordinarily complex claims with extraordinary circumstances, I can see no definitive instance or evidence in the handling of the claim, MK Lim vs. Greenwich Insurance Company, wherein Greenwich Insurance Company,

PRM or any of its representatives, followed any practice of seeking to place their financial benefit over and above that of their insured. The Lim's claim that Greenwich Insurance Company's handling of this claim rises to the level of bad faith is unfounded.

Signed this _15th_ day of October, 2010

_Danette K. Leonhardi_

Danette K. Leonhardi

Documents Reviewed:

In the course of this report, I have reviewed the following items:

- Pleadings to date: 3/18/2010 through 9/27/2010 (18)
- 14 Volumes of Claim Material dated from 8/11/2008 through 4/29/2010 covering the following Bates Stamp ranges:
- SK00001-01136
- KC00001-00555
- CF00001-0644

Payment for Services:

I am being paid $250/hour for my review and report; $350/hour for deposition testimony and $400/hour for trial testimony.

Deposition Experience, Last Four Years:

Deponent, appearing on behalf of Unigard Insurance Company, 30 (b)(6) testimony, April 22nd, 2009, Bank of America, N.A., A National Banking Association vs. Travelers Indemnity Company; the Standard Fire Insurance Company; Travelers Casualty and Surety Company (f/k/a the Aetna Casualty and Surety company,)Defendant. Travelers Indemnity Company; The Standard Fire Insurance Company and Travelers Casualty and Surety Company (f/k/a the Aetna Casualty and Surety Company), Third Party Plaintiffs vs. Unigard Insurance Company; Wausau Underwriters Insurance Company; Great American Insurance Company and Nationwide Indemnity Company, Third Party Defendants. United States District court for the Western District of Washington at Seattle, Cause No. CV07-322 RSL

**Danette K. Leonhardi**

3635 Fremont North, #407
Seattle, WA  98103
(Hm) 206.547.1349
(Cell) 206.251.2598
dleonhardi.1@netzero.com;
dkleonhardi@psecc.net
www.psecc.net

## Insurance Consultant   (2009 to Present)

Puget Sound Environmental Claim Consulting, LLC; Aka Puget Sound Claim Consulting, Seattle WA
Created **PSECC** as a claims management & consultation service offering advanced working technical
knowledge & expertise in the following areas:

**General Claim Services:**
- Handling and  investigation of  insurance claims (environmental and non-environmental)
  including:
  - Accident & Health; AD&D
  - Auto (First party and Liability )
  - Commercial Property & (General) Liability (including excess & umbrella coverages)
  - Director's & Officers, Errors & Omissions, Professional Liability
  - Inland Marine, Bond & Surety
  - Personal Property & (General) Liability (including excess & umbrella coverages
- Advanced auditing expertise in financial reviews, internal operations assessments, systems
  developments and project   procedures
- Best Practice claim procedural analysis and IT Claim utilization
- Bad Faith and Insurance Expert analysis & testimony, ECO & Unfair Claim Practices
  evaluation
- Historical policy and reinsurance treaty reconstructions; coverage review analysis
- Litigation monitoring, controls and evaluations; Arbitrations & Mediations
- Reserve reviews; IBNR analysis
- Reinsurance services ranging from underlying claim auditing to treaty/facultative analysis
  including treaty review, interpretation and application
- Risk management review, analysis, change implementation

**Environmental Services:**

Project management of commercial- or insurance company-retained environmental remediations

Environmental Risk Compliance

Environmental Education

Risk Assessments of Emerging Environmental Exposures

Regulatory affairs liaison

## (Environmental) Claim Manager & Administrator  (2000-2009)

Unigard Insurance Group/QBE Regional, Bellevue, WA

**Team and Individual Management:**

Autonomously managed complex cases, litigation and strategies involving environmental, asbestos,
construction defect and toxic tort commercial general liability claims

Directed & managed Executive Adjusters including performance reviews & goal setting

Conducted all performance-related internal auditing with emphasis on Best Practices claim procedures

Analyzed and authorized disposition of complex coverage scenarios

Developed consistent claim handling methods, strategies, procedures and policies unique to long-tail exposures and complex litigation

Developed annual budgets and evaluated ongoing budget variances

Created copyrighted LIFE CYCLE AGING system for actuarial evaluation of asbestos, construction defect and environmental claims

Developed departmental Business Continuity Plan which became model BCP for entire company

**Company Representative**

Project Manager of 30+ insurer-retained contaminated site clean-ups ranging from leaking underground storage tanks to multiple state-regulated Department of Ecology sites to USEPA Superfund sites.  Acted as company liaison to local and environmental regulatory agencies,  to insure compliance with statutory regulations

Actuarial liaison and informational contact to financial reporting agencies, including A.M. Best

Appeared as guest speaker for Underwriting Academies, insurance agencies, civic organization and high school classes on the environment and emerging toxic tort litigation

**Litigation Management**

Selected and managed 25 legal firms in 20 states including the establishment of budgetary costs, levels of reporting detail, cost containment and subsequent billing audits

Hands-on negotiator and mediator in all aspects of litigation monitoring and settlement with a specialty in multi-million dollar exposures

**Cost Recovery Management:**

Implementation of successful contribution actions against potentially responsible parties resulting in millions of dollars in recovery, directly impacting the insurer company bottom line

Reviewed, interpreted & applied reinsurance contracts for maximum dollar recovery

**IT Management**

Developed strategy and methodology for moving thousands of heavily litigated paper-based files into a paper-less, electronic environment

Developed research and tactical studies

**Reinsurance Claim Manager** (1986-2000)

John Hancock Management Co./Unigard Security Ins. Company, Seattle, WA

**HR Function:**

- Directed work flow, evaluated employee job responsibilities & performance, set goals, determined staffing & budgeting requirements

- Designed, developed & implemented employee training programs

-  Acted as corporate benefits & human resources liaison

**Auditing Management:**

- Developed claim, accounting and financial auditing standards (including Annual Statement and Schedule F reporting methods) applicable to national/international accounts

- Conducted in excess of 40 claim & accounting audits throughout the United States and foreign markets, including Brazil, France and London

- Represented corporate interests and issues to Executive-level management of client companies

- Reviewed & analyzed  U.S./international contracts and underwriting programs, authorizing final dispositions of complex contract issues

**IT Management**
- Managed legacy database systems & migration to real-time environments
- Interpreted and managed data mining techniques for statistical and actuarial review
- Developed research and tactical studies

Additional corporate work affiliates include:  Kemper Insurance Group (outside property adjuster); Chubb Insurance Group (general adjuster); Home Insurance Group (litigation supervisor)

**Degrees:**
Associate in Risk Management, ARM, American Institute for CPCU
> In Progress

Chartered Property and Casualty Underwriter, CPCU Insurance Institute of America
> In Progress

Master of Business Administration  University of Puget Sound, Seattle, WA
> General business curriculum with emphasis on international marketing/finance

Bachelor of Arts, Business Administration  University of Washington, Seattle, WA
> General business curriculum with emphasis on quantitative methods

**Supplemental Education:**
- Extensive course & seminar attendance in areas related to:  insurance/reinsurance law; contract construction & provisions; insurance regulatory law; general insurance industry Best Claim Practices; insurance & reinsurance accounting & underwriting procedures; Worker's Compensation; risk management; human resource management
- Pre-doctoral studies, California Coast University, Santa Ana, CA

## Danette K. Leonhardi, MBA



Danette has over 31 years of experience handling virtually every type of Property and Casualty insurance claim. For the last 24 years she has focused professionally on environmental claims and toxic tort claims at international, national and regional levels for both insurer and reinsurer interests. These claims have included extremely varied exposures ranging from asbestos to Agent Orange, Agent Blue, Agent White, Black Lung, Baker's Lung, DES, formaldehydes and lead paint. She has worked with environmental issues in multi-jurisdictional capacity and has been responsible for and has intimate knowledge of Case Law in all of her territories. She has had extraordinary success in bringing interested parties to resolution on cases ranging from small leaking underground storage tank claims to National Accounts with national, local and USEPA exposure. Ms. Leonhardi is a hands-on negotiator and mediator, regularly attending site inspections, site clean-ups and regulatory meetings. She has been responsible for the maintenance of national coverage strategies, claim-handling policies and the development of training/auditing procedures in the course of numerous years in a management capacity. She is also an educator, conducting webinars and in-person speaking with Underwriting Academies, civic organizations and high school classes on the environment and related emerging issues.



**Professional Affiliations**
- Defense Research Institute
- Emerging & Environmental Claim Manager Association
- Excess/Surplus Lines Claims Association
- Reinsurance Association of America
- Seattle Casualty Claims Adjusters Association

**Fields of Expertise**
- Multi-line Claims Handling Including GL/Property/D&O/E&O/Medical Malpractice/Business Interruption/Inland Marine
- Policy Reconstruction
- Insurance Coverage Analysis
- Claim Handling Agreements
- Insurance Claim Auditing
- Reserve Analysis
- Mediation & Arbitration
- Bad Faith Analysis
- Claim Investigation & Maintenance
- Site Management
- Litigation Monitoring
- Reinsurance Quota Share and Treaty Analysis
- Facultative Treaty Analysis
- Ceded & Retroceded  Cost Recovery Analysis
- Underlying Claim Auditing (Reinsurance; Excess & Surplus Lines)
- Construction Defect Claims

**Education**
- BA in Business Administration (Quantitative Methods), University of Washington, Seattle
- Masters in Business Administration (International Finance), University of Puget Sound, Tacoma

**Insurance Company Experience**
- The Kemper Insurance Companies/Seattle
- The Chubb Group of Companies/San Jose
- The Home Insurance Company/New York
- Unigard Security Insurance Company/Seattle
- John Hancock Management Company/Boston
- Eastgate, Ltd/London
- Unigard Insurance/QBE/New York

**Key Accomplishments**



- Created Life Cycle Aging system for actuarial and evaluation of asbestos and environmental claims
- Developed and implemented education and training curriculum for both reinsurer and insurer personnel
- Insurer Project Manager of 30+ pollution site clean-ups ranging from leaking underground storage tanks to State-regulated Department of Ecology sites
- As a reinsurance company consultant and claim manager, conducted in excess of 40 claim/accounting department audits throughout the United States
- Extracted insurer company from mass Declaratory Judgment action by a major oil company prior to incurring transaction costs
- Company Representative to regulatory agencies at both local and national level
- Implementation of successful contribution actions resulting in hundreds of thousands of dollars in recovery, directly impacting the insurer company bottom line
- Responsible for successful carrier-to-carrier contribution action claim wherein the insurer recouped its basic costs + substantial interest, amounting to an excess of its paid figures
- Supervised litigation in which a $30 million default judgment was set aside against insurer, ultimately settling for policy limits of $500,000
- Directed litigation involving a joint venture with five partners and five defense firms; City and State regulators with minimal litigation.
- First Insurer to settle out insured interest in major USEPA Superfund litigation involving a NJ landfill involving hundreds of defendants

**Puget Sound Environmental Claim Consulting, LLC**
**3635 Fremont North, Suite 407**
**Seattle, WA  98103**
**206.251.2598**
**dleonhardi@psecc.net**

**www.psecc.net**